RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0119p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

WILLIAM GLENN ROGERS,

        *Petitioner-Appellant*,

    *v.*

TONY MAYS, Warden,

        *Respondent-Appellee*.

No. 19-5427

————————————

On Petition for Rehearing En Banc
United States District Court for the Middle District of Tennessee at Nashville.
No. 3:13-cv-00141—Waverly D. Crenshaw, Jr., Chief District Judge.

Argued En Banc:  March 8, 2023

Decided and Filed:  June 5, 2023

Before:  SUTTON, Chief Judge; MOORE, CLAY, GIBBONS, GRIFFIN, KETHLEDGE, STRANCH, THAPAR, BUSH, LARSEN, NALBANDIAN, READLER, MURPHY, DAVIS, and MATHIS, Circuit Judges.

————————————

## COUNSEL

**ARGUED EN BANC:**  Kelley J. Henry, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Nashville, Tennessee, for Appellant.  J. Matthew Rice, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.  **ON SUPPLEMENTAL BRIEF:**  Kelley J. Henry, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Nashville, Tennessee, Kimberly S. Hodde, HODDE & ASSOCIATES, Nashville, Tennessee, David R. Esquivel, Angel Lasley, BASS, BERRY & SIMS PLC, Nashville, Tennessee, for Appellant.  J. Matthew Rice, Richard D. Douglas, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.  **ON AMICUS BRIEF:**  Michael R. Wajda, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Amicus Curiae.

      THAPAR, J., delivered the opinion of the court in which SUTTON, C.J., GIBBONS, GRIFFIN, KETHLEDGE, BUSH, LARSEN, NALBANDIAN, READLER, MURPHY and

DAVIS, JJ., joined, and MATHIS, J., joined in part.  MATHIS, J. (p. 23), delivered a separate opinion concurring in part and dissenting in part.  MOORE, J. (pp. 24–38), delivered a separate dissenting opinion in which CLAY and STRANCH, JJ., joined, and MATHIS, J. joined in part.

———————————

**OPINION**

———————————

THAPAR, Circuit Judge.  In 1996, nine-year-old Jacqueline Beard left her mother's watchful gaze to pick blackberries.  William Glenn Rogers made sure she never returned.  After stalking Jackie for days, he kidnapped, raped, and murdered her.  Then he disposed of her body in the woods, where hunters found her remains four months later.

At trial, a jury found Rogers guilty and sentenced him to death.  Since then, Rogers has spent more than two decades challenging his conviction and sentence.  In a thoughtful and exhaustive opinion, Chief Judge Waverly Crenshaw denied Rogers's federal habeas petition.  We affirm.

I.

A.

Jackie was a "friendly, happy, and well-liked child."  *Rogers v. State*, 2012 WL 3776675, at *9 (Tenn. Crim. App. Aug. 30, 2012) (quoting *State v. Rogers*, 2004 WL 1462649, at *10 (Tenn. Crim. App. June 30, 2004)).  Even though she was just nine years old, she played three instruments:  guitar, organ, and drums.  And she put her musical talents to good use—every year, she sang a solo in church.

But that all changed on July 3, 1996.  Jackie, her brother, and a friend were playing at a local mudhole when Rogers approached.  From the beginning, Rogers preyed on the children's innocence.  To earn the children's trust, he claimed to be an undercover police officer and offered to take them swimming.  He also told the children that he would bring them fireworks.  But the children did not go with him.  Instead, Jackie ran home to get her mom.

In the meantime, Rogers made good on his promise by bringing fireworks to the children at the mudhole. When Jackie returned with her mom, Rogers continued to impersonate an undercover police officer. During their conversation, Rogers warned Jackie's mom about all the "sickos in the world." *Id.* at *1. But Jackie's mom rejected Rogers's offer to take the children swimming and brought the children home.

Unfortunately, that was not the last time that Jackie saw Rogers. Only a few days later, Rogers showed up at Jackie's home, claiming to be looking for lost keys. After a brief discussion, Jackie's mom sent Rogers away. But Rogers would not be deterred.

That afternoon, Jackie went outside to pick berries. Her mom told her to be back in fifteen minutes. When fifteen minutes passed, her mom went outside to get her, but Jackie was nowhere to be found. That led Jackie's mom to organize a small search party to look for her missing daughter. Sadly, the group did not find Jackie either. So Jackie's mom called 911 to report her daughter missing.

Rogers arrived at his house later that evening. According to his wife, Rogers's shirt had blood on it. His pants were also streaked with mud, as if he had tried to wipe them off. Later, when Rogers's wife got in their car, she saw small fingerprints dragging down the passenger-side windshield.

The police investigation immediately focused on Rogers. Eventually, Rogers confessed to vehicular homicide. In a series of inconsistent statements, Rogers claimed that he accidentally ran over Jackie, drove to a bridge, and tossed her body into the river below. But that turned out to be a lie. Jackie's body did not end up in the river.

Four months after Jackie disappeared, hunters discovered her remains in a park. It happened to be the same park Rogers visited with his wife just days before Jackie went missing. On their way home, Rogers and his wife stopped for a picnic, and Rogers told his wife that he had just discovered an area so remote "you could bury a body back here and nobody would ever find it." *Id.* at *2.

Along with Jackie's remains, the police found some of her clothes, including her shorts and an inside-out shirt. In the crotch of Jackie's shorts, investigators identified what turned out to be sperm, but they could not obtain a DNA profile from it.

B.

The State of Tennessee charged Rogers with multiple crimes, including first-degree murder. A jury convicted him on all counts, and the case proceeded to the penalty phase. *State v. Rogers*, 188 S.W.3d 593, 601 (Tenn. 2006).

During the penalty phase, Tennessee introduced evidence of Rogers's prior convictions for two counts of aggravated assault. And Jackie's family members told the court how Jackie's murder had devastated their family. Wracked by nightmares and guilt, Jackie's mom could not sleep. She lost her job. Jackie's brothers—Joshua and Jeremy—were in pain too. Jeremy was hospitalized for post-traumatic stress disorder and placed in juvenile homes.

Next, Rogers presented mitigation evidence about his difficult and abusive upbringing. Rogers's stepfather beat him—in at least one instance, he used a baseball bat. He also rubbed Rogers's face in urine and excrement when Rogers wet the bed or soiled his pants. When Rogers tried to run away, his mother and stepfather chained him to his bed. They also prevented Rogers from seeing his biological father and deprived Rogers of food. In addition, Rogers claimed that several adults, including his stepfather's brother, sexually abused him.

Seeking to avoid the death penalty, Rogers also presented psychological and psychiatric evidence. One of his expert witnesses, Dr. Mark Cunningham, testified that a lengthy sentence would likely prevent Rogers from committing any more violence. On cross, though, he admitted that Rogers had escaped before from prison and would be a "significant risk" if allowed back into society. *Rogers*, 2012 WL 3776675, at *15 (quoting *Rogers*, 2004 WL 1462649, at *15).

Ultimately, the jury sentenced Rogers to death. The jury found four aggravating factors beyond a reasonable doubt:

1. Jackie was under twelve years old when she was killed, and Rogers was over eighteen;
2. Rogers had previously been convicted of one or more violent felonies;
3. Rogers killed Jackie to avoid, interfere with, or prevent his arrest; and

4. Rogers knowingly killed Jackie while he had a substantial role in committing or attempting to commit a rape or kidnapping.

*See* Tenn. Code Ann. § 39-13-204(i)(1)–(2), (6)–(7). Weighing those factors against Rogers's mitigating evidence, the jury imposed the death penalty. *See id.* § 39-13-204(g)(1).

After losing his appeals, Rogers filed for state post-conviction relief. But the Tennessee trial and appellate courts rejected all of his claims. *Rogers*, 2012 WL 3776675, at *32, *60. Rogers then petitioned for a federal writ of habeas corpus, which Chief Judge Waverly Crenshaw denied. *Rogers v. Westbrooks*, 2019 WL 1331035, at *117 (M.D. Tenn. Mar. 25, 2019). Nonetheless, Chief Judge Crenshaw granted a certificate of appealability, which a panel of this court expanded. *Id.* at *118; *Rogers v. Mays*, 814 F. App'x 984, 988 (6th Cir. 2020) (order). Relevant here, that same panel then granted habeas relief on one ineffective-assistance-of-counsel claim and reversed and remanded another. *Rogers v. Mays*, 43 F.4th 530, 567–68 (6th Cir. 2022). Judge Helene White dissented in part. *Id.* at 568–69 (White, J., concurring in part and dissenting in part). We granted rehearing en banc. *Rogers v. Mays*, 54 F.4th 443 (6th Cir. 2022) (order).

## II.

Federal habeas review "intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." *Harrington v. Richter*, 562 U.S. 86, 103 (2011) (citation omitted). As a result, habeas is "an extraordinary remedy, reserved for only extreme malfunctions in the state criminal justice system." *Brown v. Davenport*, 142 S. Ct. 1510, 1524 (2022) (cleaned up).

To receive relief, habeas petitioners must clear several hurdles, two of which are relevant here: the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) and the procedural-default doctrine. We begin with the claims that fail under AEDPA.

## A.

Rogers first claims that his trial counsel was ineffective for failing to investigate and challenge the sperm evidence found in the crotch of Jackie's shorts.

Before the state court, Rogers had to show that counsel performed deficiently and that he suffered prejudice as a result. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). But before this court, he must clear a higher bar if the claim "was adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d). So to determine the proper standard of review, we must first decide whether the state court adjudicated this claim on the merits.

1.

Federal courts presume that every claim presented to a state court has been adjudicated on the merits. *Richter*, 562 U.S. at 99. To rebut that presumption, the petitioner must show "very clearly" that the state court overlooked his claim. *Johnson v. Williams*, 568 U.S. 289, 303 (2013). Rogers has not done that. Instead, he litigated this case all along as if the state court had adjudicated this claim.

First, in his state post-conviction petition, Rogers claimed that counsel failed to adequately investigate and challenge the rape evidence. He noted that expert testimony about sperm in Jackie's shorts affected both his convictions in the guilt phase and "the finding of the felony murder/rape aggravator in the penalty phase." R. 26-14, Pg. ID 9764. In other words, Rogers presented one ineffective-assistance claim that applied to both of the jury's decisions: first, to convict Rogers, and second, to impose the death penalty.

Indeed, that is exactly how the Tennessee Court of Criminal Appeals adjudicated this claim. It concluded that trial counsel performed deficiently but that Rogers had not suffered prejudice because he had not "established that the jury's verdicts [we]re unreliable." *Rogers*, 2012 WL 3776675, at *47. By using the word "verdicts," the court was referring to the jury's guilt *and* penalty determinations. But even assuming one could read the state court's opinion differently, our conclusion would not change. Why? Because under *Richter* and *Johnson* we presume Rogers's claim has been adjudicated on the merits unless the state-court decision "very clearly" overlooked Rogers's penalty-phase claim. *Johnson*, 568 U.S. at 303; *see Richter*, 562 U.S. at 99. And Rogers certainly has not overcome that strong presumption.

Instead, even on federal habeas review, Rogers has continued to concede that the state court adjudicated this claim. First, in his federal habeas petition, he listed it as an adjudicated

claim. Then, in both his original and supplemental briefs before our court, he admitted that "the state court addressed this claim on the merits." Appellant Br. 142; *see* Appellant Supp. Reply Br. 1 ("The parties agree that it is reasonable to conclude that the state court resolved the issue.").

The dissent sees it differently. It claims that the state court did not address the sentencing portion of Rogers's ineffective-assistance claim. But the dissent does not give the state court due respect under AEDPA. Nor does it accord with the Supreme Court's instruction that litigants, not judges, know their cases best. *Johnson*, 568 U.S. at 306. If a habeas petitioner believes a state court overlooked his claim, he should move for reconsideration on those grounds. Otherwise, federal courts should treat it as adjudicated. *See id.* (stating that the petitioner "knows her case better than anyone else, and the fact that she does not appear to have thought that there was an oversight makes such a mistake most improbable"). Like the petitioner in *Johnson*, Rogers neither moved the state court for reconsideration nor argued in subsequent proceedings that the state court had overlooked the claim.

Thus, Rogers's claim was "adjudicated on the merits." 28 U.S.C. § 2254(d).

2.

Because Rogers's claim was adjudicated on the merits, AEDPA permits relief only if the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or (2) "was based on an unreasonable determination of the facts." *Id.* Rogers argues both legal and factual error. We address each argument in turn.

*Contrary to, or Unreasonable Application of, Clearly Established Federal Law.* Rogers argues that the state court's decision was both "contrary to" and an "unreasonable application of" clearly established law from the Supreme Court. *Id.* § 2254(d)(1). He is mistaken on both counts.

First, the state court's decision was not contrary to *Strickland*. A state-court decision is "contrary to" clearly established federal law only if it (1) applies a rule that directly conflicts

with a rule prescribed by the Supreme Court or (2) confronts a case with materially identical facts to a Supreme Court decision and decides the case differently. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000) (O'Connor, J., delivering the opinion of the Court in relevant part) (*Terry Williams*). But the state court did neither here. The state court accurately quoted *Strickland*'s rules at length as it recited the ineffective-assistance standard. *Rogers*, 2012 WL 3776675, at *32–34. And *Strickland* did not involve materially identical or even similar facts. That case did not involve a failure to investigate forensic evidence of rape—in fact, it was not a rape case at all. *See Strickland*, 466 U.S. at 671–72, 675–76.

Second, the state court did not unreasonably apply *Strickland*. *See* 28 U.S.C. § 2254(d)(1). A state-court decision satisfies this standard only if it applies Supreme Court precedent in a way that no fair-minded judge could accept. *Richter*, 562 U.S. at 102–03. This inquiry turns in part on how general the clearly established federal rule is. "The more general the rule, the more leeway" state courts get to apply it. *Id.* at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). And when we apply the highly deferential AEDPA standard to the already deferential *Strickland* standard, we give the state-court decision double deference. *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011). Under that doubly deferential standard, the state-court decision passes muster.

The "benchmark" for an ineffective-assistance claim is whether counsel's actions "so undermined" the trial that it could not have produced a just result. *Strickland*, 466 U.S. at 686. So *Strickland*'s prejudice component requires the petitioner to show a reasonable probability that the trial would have gone differently but for counsel's errors. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Here, the state court faithfully applied the *Strickland* prejudice standard. The court carefully recounted the evidence presented at trial along with the evidence Rogers claimed should have been presented and concluded that the new evidence would not have made a difference. *Rogers*, 2012 WL 3776675, at *44–47.

First, the court considered the testimony of Mark Squibb, a government scientist who tested Jackie's shorts for semen. Squibb performed an acid phosphatase test, which returned

positive results in four areas, indicating "semen stains or possible semen stains." R. 25-8, Pg. ID 4560. Next, he cut a sample from each of those four areas for confirmatory tests. Those confirmatory tests came back positive on three samples. Thus, Squibb concluded that semen was present on at least three samples and labeled the fourth inconclusive.

During the trial, the jury also heard the limitations of this evidence. For example, Squibb thought the semen was human, but he was not certain. Likewise, Meghan Clement, another forensic scientist, testified at trial that she could not obtain a DNA profile from the samples cut out of Jackie's shorts. She offered four explanations: (1) the DNA had degraded over time, (2) there was not enough DNA, (3) there was more than one person's DNA, or (4) something like dirt had contaminated the DNA.

At the post-conviction proceeding, Clement gave more information about her unsuccessful DNA testing. And both Squibb and Clement testified in more detail about how to interpret the results of an acid phosphatase semen test. Squibb clarified that he obtained "weak positive" results from the acid phosphatase tests on Jackie's shorts. *Rogers*, 2012 WL 3776675, at *46 (quotation marks omitted); R. 26-10, Pg. ID 8362. Plus, Squibb tested the samples for P30—an antigen found only in semen—but came up empty.

In addition, when Squibb looked at the samples under a microscope, he confirmed only a few sperm heads. This was important because sperm and semen are not the same thing—rather, sperm (a cell) is one component of semen (a fluid). And Rogers has a theory that purports to explain the presence of a few sperm heads, but not semen.

Rogers believes that sperm could have ended up in Jackie's shorts by a means other than rape: the laundry. He bases his theory on a 1996 Canadian study, which he claims his counsel should have presented. Basically, Rogers theorizes that the washing-machine study and his other evidence about the experts' testing are so persuasive that, if the jury had heard the evidence, it would not have sentenced him to death. But the state court properly found this theory too speculative to prove prejudice. Indeed, the washing-machine study would not have made any difference unless the jury accepted the following chain of inferences: (1) Jackie's mom used the same or similar detergent and wash cycle as in the Canadian study, (2) someone in Jackie's

house was sexually active and deposited semen onto his own clothing, (3) that clothing was washed with Jackie's, (4) sperm jumped from that person's clothing to Jackie's in the washing machine, (5) that same sperm happened to land in the crotch of the shorts Jackie wore the day she was murdered, and (6) an identifiable amount of that sperm remained in Jackie's shorts for months while they sat out in the woods.

Even Rogers's own trial counsel testified that he was not sure he "could have gotten a jury to swallow" the washing-machine theory. *Rogers*, 2012 WL 3776675, at *24. That gave him good reason not to present it. As any good trial lawyer knows, presenting far-fetched theories risks your credibility with the jury, not just on one issue but on the entire case. One wonders why a good lawyer would take such a risk to challenge evidence that was already inconclusive. *See* R. 26-9, Pg. ID 8154–55 (Rogers's counsel testifying that he "wasn't as concerned" once he heard that the DNA testing was inconclusive). Indeed, our caselaw recognizes an attorney may actually be deficient for pursuing a "far-fetched" theory. *McFarland v. Yukins*, 356 F.3d 688, 709 (6th Cir. 2004) (citing *Griffin v. McVicar*, 84 F.3d 880, 890 (6th Cir. 1996)).[1]

To be sure, Clement testified that she had presented the washing-machine study in a previous child-rape case where the defendant was found not guilty. But that case further demonstrates why presenting the washing-machine study here would have had pitfalls. There, investigators were able to develop a DNA profile from sperm they found in six pairs of the girl's underwear. An acid phosphatase test came back negative, yet investigators found sperm not just in the crotch but "all over." R. 26-10, Pg. ID 8325. If sperm truly does transfer between clothes in the washing machine, it would be all over, not concentrated in one area of one item. But here, Squibb identified sperm only in the crotch of Jackie's shorts where an acid phosphatase test identified "semen stains or possible semen stains." R. 25-8, Pg. ID 4559–60. And he did not

---

[1]The dissent argues that we "patently contradict[] the state court opinion." Dissent at 25 n.1. But the dissent misunderstands both AEDPA and our opinion. AEDPA does not require us to defer to state-court decisions when we *deny* relief. In contrast, we may *grant* relief only if the petitioner overcomes AEDPA deference. *See* 28 U.S.C. § 2254(d). And even if the dissent's interpretation of AEDPA were proper, it would not change anything because the state court did not conclude that Rogers's counsel was deficient for failing to pursue a far-fetched theory. Rather, the state court reasoned that "Trial Counsel should have done a more thorough job attacking Squibb's testimony." *Rogers*, 2012 WL 3776675, at *47. Our only point is that the washing-machine theory is far-fetched.

find any sperm on Jackie's shirt. Nor could investigators develop a DNA profile from the sperm. So, as the state court reasonably concluded, the evidence did not support the washing-machine theory. *Rogers*, 2012 WL 3776675, at \*47. Indeed, the evidence cut against it.

After thoroughly cataloguing all this evidence, the state court concluded that Rogers's counsel should have challenged the state's forensic evidence more forcefully. *Id.* But it also concluded that Rogers had not suffered prejudice from counsel's deficiency. *Id.* According to the state court, the additional evidence would not have made any difference because it only emphasized what the jury already knew: testing did not conclusively show the sperm came from Rogers. *Id.* That was a reasonable application of the fact-bound *Strickland* prejudice standard.

Rogers next faults the state court for saying that he could not "eliminate or completely discredit the State's proof that sperm heads were found in the crotch area of [Jackie's] shorts." *Id.* He claims that four words in that sentence—"eliminate or completely discredit"—were contrary to *Strickland*. But, as the Supreme Court has repeatedly held, we may not flyspeck state-court opinions. *See Johnson*, 568 U.S. at 300 ("[F]ederal courts have no authority to impose mandatory opinion-writing standards on state courts."); *Coleman v. Thompson*, 501 U.S. 722, 739 (1991) (similar). This makes sense. After all, AEDPA instructs us to look for "a *decision*"—not a few words or a stray thought—"that was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1) (emphasis added). The goal is to protect against "extreme malfunctions in the state criminal justice system," not to create a grading system for state-court opinion writing. *Davenport*, 142 S. Ct. at 1524 (citation omitted).

Taking the state court's 75-page opinion as a whole and reading those words in context, the state court's decision closely tracks the legal standard prescribed by the Supreme Court. To show prejudice, Rogers would have had to "undermine confidence in the jury's sentence of death." *Pinholster*, 563 U.S. at 190. That is difficult when the State presented uncontroverted evidence that Rogers was the last person to see Jackie alive and that sperm was found concentrated in the crotch area of her shorts. The jury already knew that DNA testing did not conclusively identify Rogers as the source of the sperm. So the state court properly concluded

that neither the additional details about the testing nor the washing-machine theory would have made any difference to Rogers's sentence.

The dissent disagrees. Applying de novo review, the dissent faults us for not discussing the history and details of the death penalty in Tennessee and far-afield Supreme Court precedent. But we need not discuss those materials because AEDPA narrowly focuses us on whether the state court contradicted or unreasonably applied clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

Even on its own terms, the dissent falters. As Judge White thoughtfully pointed out, if the jury discounted the rape altogether, it "would still have been confronted with the premeditated and calculat[ed] kidnapping and murder of a 9-year-old whose shirt had been removed and whose shorts contained sperm in the inside crotch—albeit from an unknown source." *Rogers*, 43 F.4th at 568 (White, J., concurring in part and dissenting in part). The jury listened to Rogers's own wife testify that she saw small fingerprints drag down the passenger side windshield of the car. It listened to testimony that Rogers admitted to killing Jackie and disposing of her body. These "highly inflammatory and disturbing" facts would have most likely resulted in the same sentence. *Id.*

Thus, the state court's conclusion that Rogers could not undermine the jury's sentence was not an unreasonable application of *Strickland*.

*Unreasonable Determination of Fact.* Rogers argues that the state court's discussion of the rape evidence was based on several unreasonable determinations of fact. Specifically, he claims that the state appellate court omitted or misdescribed facts that would have helped demonstrate prejudice. But this challenge largely repackages a legal argument as a factual one. *See Bergman v. Howard*, 54 F.4th 950, 961 (6th Cir. 2022), *cert. denied*, --- S. Ct. ---, 2023 WL 3158441 (May 1, 2023).

Appellate courts seldom make factual findings—rather, they decide whether "historical facts" satisfy a "legal test." *Id.* (citation omitted). *Strickland* is the classic example of this. The *Strickland* inquiry requires the appellate court to apply the legal standard—undermining confidence in the jury's verdict—to the facts found by the trial court. *See Strickland*, 466 U.S. at

694; *Bergman*, 54 F.4th at 962.  So when a habeas petitioner challenges a state-court decision that applies the law to given facts, he makes a legal challenge that we review under 28 U.S.C. § 2254(d)(1).  *Bergman*, 54 F.4th at 962.

That is exactly what Rogers does.  Most of his purported factual arguments are claims that the state court omitted or misdescribed subsidiary details in making its legal determination. *See, e.g.*, Appellant Br. 151 (arguing that habeas relief is appropriate "[b]ecause the [state] court's determination of the merits of this issue was based upon inaccurate facts and inferences").  But judgments about which facts satisfy the *Strickland* standard are *legal* questions.  Thus, Rogers must show that the state court's decision was either "contrary to" or an "unreasonable application of" clearly established law from the Supreme Court.  28 U.S.C. § 2254(d)(1).  He has not done so.

First, Rogers claims that the court omitted important information about the peer-review process that showed that Squibb's testing was unreliable.  But the peer-review process actually bolsters Squibb's testing.  Squibb testified that his colleagues spot-checked his work.  True, they did not check every single sperm head Squibb identified, but they verified at least some of the sperm heads on two samples.  If anything, that increases the confidence in Squibb's analysis.

Second, Rogers claims that the state court should have recounted Clement's unsuccessful attempts to identify semen in Jackie's shorts years after trial.  But the state court *did* note that in its detailed statement of the facts.  *See Rogers*, 2012 WL 3776675, at *29 ("In addition to trying to extract DNA from the cloth samples in 2009, Clement also performed a 'presumptive test for acid phosphatase as well as a test for the presence of P30, which is an antigen found in seminal fluid and those revealed negative results.'  The laboratory also examined the cloth samples microscopically, but did not find spermatazoa [sic] present.").  And in its analysis, the court referred to "the scientific and technical evidence produced at the [post-conviction] hearing." *Id.* at *46 (alteration in original).

The state court did not act unreasonably by describing that evidence more generally than Rogers would have liked.  At some point, the state court must decide what details from the voluminous record are important enough to include in its discussion.  We review that decision

for reasonableness—we are not permitted to nitpick the opinion-writing practices of busy state courts. *See Johnson*, 568 U.S. at 300; *Coleman*, 501 U.S. at 739. And here, the state court reasonably decided not to repeat details about Clement's testing. It was also not an unreasonable application of *Strickland* to conclude that that testing's negative results did not show prejudice.

Third, Rogers argues that the state court unreasonably portrayed Clement as agreeing with Squibb's finding of semen. But Rogers is incorrect. The state court wrote that "Clement agreed at the post-conviction hearing with Squibb's finding of sperm heads." *Rogers*, 2012 WL 3776675, at *47. And that accurately represents her testimony, in which she stated, "Oh yes, there were definitely sperm heads present." R. 26-10, Pg. ID 8347. Far from being unreasonable, the state court's opinion was accurate.

In sum, the state court's decision was not contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1). Therefore, Rogers is entitled to no relief on this claim.

B.

Rogers brings two other claims subject to AEDPA's deferential standard. First, he claims the Tennessee Supreme Court unreasonably concluded there was sufficient evidence to convict him of rape and felony murder in perpetration of a rape. Second, he claims that the court unreasonably excluded exculpatory evidence. The district court and a panel of our court both rejected these claims. We do too.

*Sufficiency of Evidence of Rape.* Sufficient evidence supports a conviction if, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In Rogers's direct appeal, the Tennessee Supreme Court concluded that sufficient evidence supported Rogers's child-rape conviction. *Rogers*, 188 S.W.3d at 617. Now, Rogers claims the court unreasonably applied *Jackson* by failing to discuss penetration, one element of child rape under Tennessee law. *See* Tenn. Code Ann. § 39-13-522(a).

Rogers presented this claim to the Tennessee Supreme Court on direct review. Thus, we consider only the evidence before that court at the time it decided the claim—the trial evidence. *See Pinholster*, 563 U.S. at 180–81. Viewing this evidence through the *Jackson* prism, the Tennessee Supreme Court reasonably concluded there was sufficient evidence to convict Rogers of raping Jackie. First, there was the sperm in Jackie's shorts. Second, Rogers was the last one to see Jackie alive, which would allow the jury to infer that he was the source of the sperm. Finally, her shirt was inside out, which the jury could have reasonably inferred was because Rogers pulled it off.[2] *See Rogers*, 188 S.W.3d at 617. In short, the Tennessee Supreme Court's conclusion was not only reasonable but correct.

*Exclusion of Evidence.* The Constitution gives states "broad latitude" to exclude evidence in criminal trials. *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (citation omitted). But the Supreme Court carved out a narrow, fact-specific exception to this principle in *Chambers v. Mississippi*, 410 U.S. 284 (1973). In *Chambers*, the defendant was accused of shooting a police officer but consistently denied it. *Id.* at 287. Another man, Gable McDonald, confessed to shooting the officer and then recanted his confession. *Id.* at 287–88. The defendant called McDonald as a witness at trial, but the court refused to let the defendant treat McDonald as an adverse witness. *Id.* at 291–92. The court also excluded the testimony of three other witnesses who would have corroborated McDonald's confession. *Id.* at 292–93. The Supreme Court held that these two evidentiary decisions—the refusal to deem McDonald an adverse witness and the exclusion of the three witnesses' testimony—*together* violated the defendant's due-process rights. *Id.* at 302. In sum, "the holding of *Chambers*—if one can be discerned from such a fact-intensive case"—is narrow. *Montana v. Egelhoff*, 518 U.S. 37, 53 (1996) (plurality op.). Multiple erroneous evidentiary rulings excluding reliable, direct evidence of actual innocence in a criminal case can, in combination, violate due process. *Id.*

Here, the Tennessee Supreme Court did not contradict or unreasonably apply the narrow holding of *Chambers*. Rogers attempted to introduce evidence that Jeremy allegedly had sex

---

[2]Rogers argues that animals or other nonsexual causes could explain why Jackie's shirt was inside out. But we must draw all reasonable inferences in favor of the jury's verdict. *Jackson*, 443 U.S. at 319. Here, that means inferring that Jackie's shirt was inside out because Rogers pulled it off her.

with his sister at least five years before she disappeared (when Jeremy was, at most, seven years old and Jackie was, at most, three years old). That theory was based solely on comments Jeremy—who suffered from mental illness—could not remember making. *Rogers*, 188 S.W.3d at 611–12. The state court excluded that evidence because, if the incident even happened, it was "remote in time and irrelevant and possibly confusing to the jury." *Id.* at 612. Even assuming the state court should have admitted that evidence, that is a single evidentiary error, not the kind of cumulative error at issue in *Chambers*.

In addition, that evidence would not establish Rogers's innocence. Rogers's theory was that someone else (most likely Jeremy) had sex with Jackie. But, even if Jeremy had sex with his sister years before she disappeared, Rogers gives us no reason to believe sperm stays in clothing for that long. So this evidence does not show that the sperm in Jackie's shorts came from Jeremy. Rogers might have attempted to connect this evidence to the sperm in Jackie's shorts by asking Jeremy if he had sex with his sister shortly before her abduction. But when Rogers had the opportunity to ask that question, he declined. Finally, the evidence here is much weaker than the evidence in *Chambers* because Jeremy could not remember telling anyone that he had sex with his sister.

Because this case does not implicate the narrow holding of *Chambers*, the state court did not contradict or unreasonably apply clearly established federal law in excluding evidence about Jeremy and Jackie's alleged sexual history. So Rogers is not entitled to relief on this claim either.

III.

Rogers brings four other ineffective-assistance-of-trial-counsel claims that he concedes he did not raise before the state courts. Because he could have brought these claims during his initial post-conviction proceedings, Tennessee law prohibits him from raising them in a subsequent petition. *See* Tenn. Code Ann. § 40-30-106(g). Thus, these claims are procedurally defaulted, and Rogers has not shown why we should excuse his default.

We may excuse a prisoner's procedural default when he shows cause and prejudice. *Murray v. Carrier*, 477 U.S. 478, 492 (1986). To demonstrate cause, a "prisoner must show that

some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Shinn v. Ramirez*, 142 S. Ct. 1718, 1733 (2022) (cleaned up).

Ineffective assistance of *post-conviction* counsel can qualify as an objective factor to excuse the procedural default of a claim of ineffective assistance at *trial* in narrow circumstances. *See Martinez v. Ryan*, 566 U.S. 1, 17 (2012). But the habeas petitioner must make three showings. First, that the state either prohibits or makes it "virtually impossible" to raise ineffective-assistance-of-trial-counsel claims on direct appeal. *Trevino v. Thaler*, 569 U.S. 413, 417 (2013) (citation omitted).[3] Second, that the petitioner received ineffective assistance of counsel in the initial state post-conviction proceedings. *Martinez*, 566 U.S. at 17. Third, that the petitioner has a substantial claim that counsel rendered ineffective assistance at trial. *Id.* at 13–14; *see also Davila v. Davis*, 582 U.S. 521, 530 (2017) ("[T]he Court in *Martinez* was principally concerned about *trial errors*—in particular, claims of ineffective assistance of *trial* counsel.").

Rogers's claims all rise and fall on the third requirement: substantiality. To be substantial, an ineffective-assistance-of-trial-counsel claim must, among other things, be supported by evidence. *Martinez*, 566 U.S. at 15–16. Rogers's claims are not substantial because (1) the state-court record is undeveloped and (2) we cannot consider the evidence he developed in federal court.

A.

At the outset, we must identify what evidence Rogers can use to support his claims subject to *Martinez*.

Generally, petitioners using *Martinez* may not rely on new evidence introduced in federal court. *Shinn*, 142 S. Ct. at 1728. That is because petitioners should bring and develop their claims in state court first. *Id.* at 1731–32. If they do not, they bear the consequences, including strict limits on their ability to introduce new evidence in federal court. *Id.* at 1734.

---

[3]Our court has held that *Trevino* applies in Tennessee, and we have no occasion to reconsider that holding here. *See Sutton v. Carpenter*, 745 F.3d 787, 790 (6th Cir. 2014).

Rogers argues that he should not be held responsible for the undeveloped state-court record. *See Williams v. Taylor*, 529 U.S. 420, 433 (2000) (*Michael Williams*). We disagree. If post-conviction counsel negligently fails to develop the state-court record, that failure is attributed to the petitioner—in this case, Rogers. *Shinn*, 142 S. Ct. at 1734–35; *see also Michael Williams*, 529 U.S. at 439–40 (attributing counsel's negligent failure to develop the state-court record to the petitioner).

Recognizing this, Rogers suggested at oral argument that the state-court record is not developed for other reasons. But he has not explained what those reasons are, so any such argument is forfeited. *Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 946 (6th Cir. 2022). Moreover, it is not clear what those other reasons could be. *Martinez* requires Rogers to argue that his state post-conviction counsel negligently failed to develop the state-court record. *See Martinez*, 566 U.S. at 12–14. And *Shinn* holds Rogers responsible for that undeveloped record. *Shinn*, 142 S. Ct. at 1735. Since Rogers's claim finds no support in the state-court record, he can support this claim only through a federal evidentiary hearing.

AEDPA prohibits the federal court from holding an evidentiary hearing unless Rogers's claim relies on (1) a new rule of retroactive constitutional law or (2) "a factual predicate that could not have been previously discovered through the exercise of due diligence." 28 U.S.C. § 2254(e)(2)(A). In addition, he must provide clear and convincing evidence of innocence. *Id.* § 2254(e)(2)(B). Finally, he must persuade the habeas court to exercise its discretion to permit an evidentiary hearing. *Shinn*, 142 S. Ct. at 1734.

Rogers has forfeited any argument that he is entitled to an evidentiary hearing under § 2254(e)(2)'s demanding standard. In his opening brief (filed before *Shinn*), Rogers admitted that his procedurally defaulted claims rely on evidence outside of the state-court record. Appellant Br. 162–63 ("Mr. Rogers will rely upon, and urges the Court to consider, evidence outside the state court record."). Nevertheless, he did not argue that he satisfied § 2254(e)(2). Nor did he make that argument in his supplemental briefs, both of which were filed after *Shinn*. Accordingly, any argument that he satisfies § 2254(e)(2) is forfeited. *See Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 256 (6th Cir. 2018).

In sum, a petitioner who has procedurally defaulted his claims of ineffective assistance by trial counsel may in some limited circumstances rely on *Martinez* to excuse his procedural default.  But he must provide evidence to show his claims are substantial.  And that evidence must come from the state-court record unless the petitioner can satisfy the stringent requirements of 28 U.S.C. § 2254(e)(2).

B.

These high barriers doom Rogers's four ineffective-assistance-of-trial-counsel claims.  Because the state-court record is undeveloped and Rogers has not satisfied § 2254(e)(2), he has not produced any facts we can consider.  Thus, he has not met *Martinez*'s substantiality requirement for any of those claims and cannot overcome his procedural default.

1.

First, Rogers argues that trial counsel was ineffective for failing to develop mitigating evidence about his personal background, difficult childhood, and possible brain damage.[4]  But to prove this claim, he must point to evidence in the state-court record, which he has not done.  *See* R. 26-8, Pg. ID 8022 (state post-conviction court observing that "no proposed mitigation evidence was presented during the evidentiary hearing").  Thus, his only alternative is to meet § 2254(e)(2).  *See Shinn*, 142 S. Ct. at 1734.  He has not done that either.  As a result, this claim does not excuse Rogers's procedural default.

2.

Second, Rogers argues that trial counsel was ineffective for failing to develop evidence that Jackie's brother, Jeremy, was the source of the sperm in her shorts.  But the state-court record does not support this claim.  As discussed, the evidence that Jeremy and Jackie allegedly had sex *years before* her disappearance neither was reliable nor did it show that Jeremy was the

---

[4]The district court denied relief on this claim because Rogers procedurally defaulted it on appeal in post-conviction proceedings. *Rogers*, 2019 WL 1331035, at *108–09; *see West v. Carpenter*, 790 F.3d 693, 694 (6th Cir. 2015) (holding that *Martinez* does not excuse claims defaulted on appeal in post-conviction proceedings).  A panel of our court disagreed. *Rogers*, 43 F.4th at 555 & n.10.  But we need not decide when it was procedurally defaulted because, even if the claim was procedurally defaulted during his initial post-conviction proceedings (in which case *Martinez* could apply), he has not identified any supporting facts we can consider. *See Martinez*, 566 U.S. at 16.

likely source of sperm. As a result, the state-court record does not support Rogers's claim of prejudice. And that is all the evidence we can consider—we cannot look at the additional evidence Rogers produced in federal court—because he has not satisfied § 2254(e)(2). *See id.* Thus, this claim also fails.

3.

Third, Rogers argues that trial counsel was ineffective for presenting Dr. Mark Cunningham's testimony. Dr. Cunningham testified that Rogers probably would not pose a threat in prison. *Rogers*, 2012 WL 3776675, at *15. But on cross-examination, Dr. Cunningham admitted that Rogers had escaped before from prison and would pose a "significant risk" to the community if he escaped again. *Id.* (citation omitted). According to Rogers, counsel's decision to present that testimony was objectively unreasonable because the evidence of his previous escape and risk to the public was so damaging. The district court and a panel of this court rejected that argument. So do we.

Under *Strickland*, we "strongly" presume counsel performed effectively. *Strickland*, 466 U.S. at 690. To rebut this presumption, Rogers must show that counsel's actions fell outside the "wide range" of competent assistance. *Id.* But the evidence shows that counsel made a reasonable, strategic decision to call Dr. Cunningham. For starters, Dr. Cunningham's testimony that Rogers would not be a danger in prison was an important piece of the defense's case that the jury should spare Rogers's life. Though important, that testimony was also risky because of Rogers's previous escape from prison and Dr. Cunningham's assessment that Rogers would be a "significant risk" if he were allowed back into society. *Rogers*, 2012 WL 3776675, at *15 (quoting *Rogers*, 2004 WL 1462649, at *15). And the trial court explicitly warned counsel that he was pursuing a risky strategy, but counsel decided to present Dr. Cunningham's testimony anyway.

Because of the potential upside of Dr. Cunningham's testimony and counsel's knowing acceptance of the risks, Rogers has failed to overcome the "strong presumption" that counsel exercised reasonable judgment. *Strickland*, 466 U.S. at 689. Because this claim is not substantial, *Martinez* will not excuse his procedural default. *See* 566 U.S. at 14.

4.

Finally, Rogers argues that counsel was ineffective for failing to contest venue and juror bias in his motion for a new trial. At the outset, it is not even clear that a petitioner may rely on *Martinez* to overcome a procedural default of claims that counsel ineffectively prepared or presented a motion for a new trial. *Compare Richardson v. Superintendent Coal Twp. SCI*, 905 F.3d 750, 761–62 (3d Cir. 2018) (holding that *Martinez* applies to claims of ineffective assistance of counsel at the motion-for-new-trial stage), *with Milam v. Davis*, 733 F. App'x 781, 784, 786 (5th Cir. 2018) (per curiam) (holding that *Martinez* does not apply to claims of ineffective assistance of appellate counsel at the motion-for-new-trial stage).

Nevertheless, we need not decide that question today because, even if *Martinez* applies at the motion-for-new-trial stage, we cannot excuse Rogers's procedural default. Like two of his other procedurally defaulted ineffective-assistance claims, this claim is "wholly without factual support." *See Martinez*, 566 U.S. at 16. Rogers failed to present his only evidence supporting this claim to the state court. *See* R. 111, Pg. ID 12941–42 (relying on a declaration given five years after state proceedings ended). So we cannot consider it. *See Shinn*, 142 S. Ct. at 1734.

Rogers also failed to adequately present this claim in his habeas petition. Rule 2(c) of the Rules Governing Section 2254 Cases requires that the petition "specify all the grounds for relief available to the petitioner" and "state the facts supporting each ground." Rogers violated this rule by devoting just one sentence to this claim in his amended habeas petition. *See* R. 14, Pg. ID 93 ("In violation of the Sixth, Eighth, and Fourteenth Amendments to the Constitution, counsel rendered ineffective assistance of counsel during the Motion for New Trial proceedings."). This provides yet another reason we cannot excuse his procedural default.[5]

---

[5]Rogers complains that the warden invoked Rule 2(c) too late in the day. Although he never uses the word "forfeiture," he seems to be making a forfeiture argument. But the warden has not forfeited this argument. Indeed, he presented this argument in his en banc briefing, which acts as a supplement to his briefing before the panel. *See United States v. Campbell*, 26 F.4th 860, 888 (11th Cir. 2022) (en banc) (Pryor, C.J., concurring) (noting that the appellee may "raise alternative arguments in support of the district court's judgment before the en banc court that it failed to raise before the panel . . . [because] we review the issues anew after granting en banc rehearing as if we were hearing the appeal directly from the district court"); *see also* 6th Cir. R. 35(b) ("A decision to grant rehearing en banc vacates the previous opinion and judgment of the court, stays the mandate, and restores the case on the docket as a pending appeal.").

\* \* \*

Jackie's mom has been waiting almost 27 years for closure. To justify further delay, Rogers would have had to carry a heavy burden. He has not. We affirm.

———————————————

**CONCURRENCE/DISSENT**

———————————————

MATHIS, Circuit Judge, concurring in part and dissenting in part. I concur in Parts I, II (except footnote 1), III(A), and III(B)(1–3) of the majority opinion. Because I agree with Judge Moore that the *Martinez-Trevino* exception applies to ineffective-assistance-of-counsel claims at the motion-for-new-trial phase in Tennessee, I dissent from Part III(B)(4) of the majority opinion for the reasons stated in Part II of Judge Moore's dissent. Therefore, I would remand the case to the district court for further consideration, including a determination of whether Rogers's claim that his counsel was ineffective at the motion-for-new-trial phase is substantial in light of *Shinn v. Ramirez*, 142 S. Ct. 1718 (2022).

I do not believe Habeas Rule 2(c) bars Rogers's claim for ineffective assistance of counsel at the motion-for-new-trial phase. "A prime purpose of Rule 2(c)'s demand that habeas petitioners plead with particularity is to assist the district court in determining whether the State should be ordered to 'show cause why the writ should not be granted.'" *Mayle v. Felix*, 545 U.S. 644, 656 (2005) (quoting 28 U.S.C. § 2243). "Rule 2(c) therefore helps put a state on notice of what claims a petitioner brings so it can properly respond to them." *Kelley v. Burton*, 792 F. App'x 396, 397 (2020). The warden was on notice of this claim, having addressed it both before the district court and before this court. In fact, the warden did not raise Rule 2(c) as a potential bar to the claim before this court until he filed his supplemental brief.

---

**DISSENT**

---

MOORE, Circuit Judge, dissenting. A Tennessee jury sentenced William Glenn Rogers to death believing that he had raped nine-year-old Jackie Beard when, in fact, his trial counsel had deficiently failed to challenge the sole evidence that allowed the jury to reach that conclusion. Since then, every court to consider Rogers's claim has concluded that his trial counsel performed deficiently in failing to challenge the semen evidence that was the *only* evidence of sexual penetration presented to Rogers's sentencing jury. Because penetration is a necessary element of rape under Tennessee law, the jury could not have concluded that Rogers raped Beard absent that evidence.

The majority decides that it was not an unreasonable application of clearly established federal law for the state court to find that Rogers was not prejudiced by his counsel's failure to challenge the semen evidence. Because it is beyond question that child rape is a particularly heinous crime, and because the Supreme Court has held that such a uniquely aggravating crime will inevitably distort the judgment of a jury, I cannot agree regarding the sentencing phase. I would therefore reverse the district court's denial of habeas relief as to Rogers's claim that his trial counsel was constitutionally ineffective in failing adequately to challenge the semen evidence and would remand to the district court with instructions to conditionally grant a writ of habeas corpus vacating Rogers's death sentence on that ground.

Likewise, because I believe that the *Martinez-Trevino* exception can excuse the procedural default of a claim of ineffective assistance of counsel at the motion-for-a-new-trial stage, I would reverse the district court's findings on that issue and remand with instructions to determine whether Rogers can overcome his procedural default of that claim. I therefore respectfully dissent.

## I.  INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING ADEQUATELY TO CHALLENGE THE SEMEN EVIDENCE

Rogers argues that his trial counsel rendered ineffective assistance of counsel by failing to investigate the serological evidence and conduct an adequate cross-examination regarding this evidence.  To demonstrate ineffective assistance of counsel, a petitioner must show "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Deficient performance requires a showing "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*  To show prejudice, Rogers must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  This probability must be "sufficient to undermine confidence in the outcome." *Id.*  "The combined effect of *Strickland* and § 2254(d) is 'doubly deferential' review." *Foust v. Houk*, 655 F.3d 524, 533 (6th Cir. 2011) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)).

### A.  Deficient Performance

The majority quickly brushes aside the fact that every court that has considered this issue has found that Rogers's counsel performed deficiently. *Rogers v. Westbrooks* ("*Rogers IV*"), No. 3:13-cv-00141, 2019 WL 1331035, at *30 (M.D. Tenn. Mar. 25, 2019); *Rogers v. State* ("*Rogers III*"), M2010-01987-CCA-R3-PD, 2012 WL 3776675, at *47 (Tenn. Crim. App. Aug. 30, 2012); R. 26-8 (Order at 59–60) (Page ID #7921–22).  The deficient performance of Rogers's counsel is also undisputed before this court.[1]  Appellee Br. at 39 n.3.  In finding that Rogers's counsel's performance was deficient, the state postconviction court explained:

---

[1]Curiously, the majority suggests that, had Rogers's counsel robustly cross-examined the state's witnesses regarding the serological evidence, Rogers's counsel might have performed deficiently "for pursuing a 'far-fetched' theory."  Majority Op. at 10 (quoting *McFarland v. Yukins*, 356 F.3d 688, 709 (6th Cir. 2004)).  This patently contradicts the state court opinion, which explained that Rogers's trial counsel performed deficiently in failing to "present evidence attacking Mr. Squibb's conclusion that the presence of sperm cells necessarily indicated the presence of semen," including "the washing machine study." *Rogers III*, 2012 WL 3776675, at *46 (quoting R. 26-8 (Order at 60) (Page ID #7922)).  Indeed, the state court specifically indicated that trial counsel's failure in that regard was "most relevant" to its finding of deficient performance. *Id.* (quoting R. 26-8 (Order at 60) (Page ID #7922)).  The majority posits that this argument misunderstands AEDPA. Maj. Op. at 10 n.1.  But it is the majority that has misunderstood.  My point is not that the majority ought to defer to the state court under AEDPA, but instead that the Supreme Court has long held that—whether deference under § 2254(d) applies or not—the court of

The testimony of Ms. Clement and Mr. Squibb at the [postconviction] hearing reveals certain deficiencies in Mr. Warner's cross-examination of those witnesses at trial. Mr. Squibb's testing produced evidence favorable to the petitioner, but counsel did not present some of this evidence to the jury. For instance, the jury did not hear there were very few (or "rare," the term used by the TBI lab to denote fewer than ten) sperm heads found on the microscopic slides developed from the victim's shorts. Mr. Squibb was also not asked about his testing for semen in great detail; the jury heard no information about the mechanics of the acid phosphatase test (color changes, timing, etc.) or that Mr. Squibb's acid phosphatase test yielded a "weak" positive result. The jury heard nothing about the P30 antigen as it related to seminal fluid or that Mr. Squibb's testing yielded negative results for P30. The jury also did not hear that very little DNA was derived from the stains taken from the victim's shorts. Perhaps most relevant, counsel for the petitioner did not present evidence attacking Mr. Squibb's conclusion that the presence of sperm cells necessarily indicated the presence of semen. Given Ms. Clement's testimony and the publication of the washing machine study in the Canadian forensic journal—an article published some four years before the trial in the instant case—such evidence was available to counsel.

R. 26-8 (Order at 59–60) (Page ID #7921–22). This court "give[s] due deference to the conclusions of the trial judge on the effectiveness of counsel, because '[t]he judge, having observed the earlier trial, should have an advantageous perspective for determining the effectiveness of counsel's conduct and whether any deficiencies were prejudicial.'" *Foster v. Wolfenbarger*, 687 F.3d 702, 708 (6th Cir. 2012) (quoting *Massaro v. United States*, 538 U.S. 500, 506 (2003)). For the reasons articulated by the postconviction court, I believe that Rogers's counsel's performance was deficient.

---

conviction is best-placed to assess trial counsel's performance. *Massaro v. United States*, 538 U.S. 500, 506 (2003). The Kentucky Supreme Court's opinion on this point deferred to the findings of the trial court. *See Rogers III*, 2012 WL 3776675, at *46 (quoting R. 26-8 (Order at 60) (Page ID #7922)). And the Supreme Court has explained that the court of conviction "ha[s] an advantageous perspective for determining the effectiveness of counsel's conduct and whether any deficiencies were prejudicial." *Massaro*, 538 U.S. at 506. This court has previously held that a state trial court's determination that counsel performed deficiently is entitled to "due deference" because that court is best positioned to understand counsel's deficiencies in light of the evidence and arguments presented at trial. *Foster v. Wolfenbarger*, 687 F.3d 702, 708 (6th Cir. 2012). I would therefore not second-guess the state trial court's assessment of Rogers's counsel's deficient performance.

**B.  Prejudice**

  **1.  AEDPA Deference**

  As an initial matter, the Tennessee Court of Criminal Appeals failed to address whether trial counsel's deficient performance prejudiced Rogers at the *sentencing* phase of his trial. *See Rogers III*, 2012 WL 3776675, at \*47.  AEDPA deference does not apply to exhausted claims that were not adjudicated on the merits in state court.  28 U.S.C. § 2254(d).  "This rule extends to portions of a claim not addressed by the state courts."  *Williams v. Anderson*, 460 F.3d 789, 796–97 (6th Cir. 2006) (citing *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)).  Because the sentencing-phase portion of Rogers's claim was not adjudicated on the merits in state court, this court ought to review de novo whether Rogers was prejudiced by his trial counsel's deficient performance.

  The majority rejects this position, arguing that the state court *did* address the sentencing-phase portion of Rogers's claim because it referred in passing to "the jury's verdicts."  Maj. Op. at 6 (quoting *Rogers III*, 2012 WL 3776675, at \*47).  But in the very next sentence of its opinion, the state court explained that the semen evidence combined with evidence that Rogers was the last person to see Beard alive "leaves us confident in the jury's *verdict*."  *Rogers III*, 2012 WL 3776675, at \*47 (emphasis added).  And the rest of the state court's analysis focuses on the culpability phase of Rogers's trial, largely relying on the reasoning of the lower court, which emphasized the jury's decision "to *convict* the petitioner."  *Id.* at \*46 (emphasis added).  The state court opinion does not contain even a single sentence analyzing the impact of trial counsel's deficient performance on the sentencing phase of Rogers's trial.  Rogers has therefore met his burden of showing that the state court "very clearly" overlooked the sentencing-phase portion of his claim.  *Johnson v. Williams*, 568 U.S. 289, 303 (2013).

  But even if the majority's theory that a passing reference to "verdicts" is sufficient to transform paragraphs of analysis regarding the culpability phase of Rogers's trial into a decision on the merits regarding the sentencing phase of that trial, Rogers can still overcome the relitigation bar imposed by 28 U.S.C. § 2254(d).  That is because the state court unreasonably

applied *Strickland* in concluding that Rogers was not prejudiced by his trial counsel's deficient performance.  In so holding, the Tennessee Court of Criminal Appeals explained:

> [T]he fact remains that Squibb found sperm heads on the fabric samples taken from the crotch area of the victim's shorts.  Clement agreed at the post-conviction hearing with Squibb's finding of sperm heads.  The victim's mother testified at trial that the victim had put the shorts on right before leaving her house and disappearing.  While Clement's testimony at the post-conviction hearing established that it is possible for sperm heads to arrive on clothing while being laundered in a washing machine, she also testified that the experiments in which such transfer occurred involved washing new clothing with "a pair of underwear worn by someone who had consensual relations."  Thus, proof of these experiments would not have been relevant at trial unless the defense had also been able to establish at least some probability that the victim's shorts had been washed with an item containing semen.  No such probability was established at the postconviction hearing.  Therefore, we cannot conclude that Trial Counsel's performance in his cross-examination of Squibb prejudiced the Petitioner.
>
> In sum, Trial Counsel should have attacked the State's proof regarding the semen/sperm issue with more vigor.  The Petitioner, however, has not established that the jury's verdicts are unreliable as a result of this failure because there has been no showing that the defense would have been able to eliminate or completely discredit the State's proof that sperm heads were found in the crotch area of the victim's shorts.  That proof, together with the substantial proof at trial that the Petitioner was the last person to see the victim alive, leaves us confident in the jury's verdict.  Accordingly, the Petitioner is not entitled to relief on this basis.

*Rogers III*, 2012 WL 3776675, at *47.

In determining prejudice, courts look at "the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695.  "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696; *see Foster*, 687 F.3d at 710.  To establish felony murder in perpetration of a rape, the state was required to prove that Rogers killed Beard "in the perpetration of or attempt to perpetrate . . . rape." Tenn. Code Ann. § 39-13-202(a)(2) (1996).  And to establish rape, the state was required to prove that there was "unlawful sexual penetration." *Id.* § 39-13-522(a).  Sexual penetration is defined by Tennessee law as "sexual intercourse . . . or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's . . . body." *Id.* § 39-13-501(7).

The only evidence of penetration was the sperm heads on Beard's shorts, and Rogers's counsel's undisputed deficiencies directly relate to this evidence. As the Tennessee courts acknowledged, if counsel had not been deficient, the jury would have been able to hear that there were very few (fewer than ten) sperm heads on the slides developed from the shorts, that the acid phosphatase test yielded only a weak positive result, that the P30 antigen test was negative, that very little DNA could be taken from the sperm, that sperm does not necessarily indicate the presence of semen, and that sperm can be transferred between different items of clothing in the washing machine. *Rogers III*, 2012 WL 3776675, at *46. Together this evidence calls into question whether there was semen on the shorts—which, again, was the only evidence of penetration presented by the prosecution. The Tennessee Court of Criminal Appeals thus unreasonably applied *Strickland* when it found that this deficiency did not prejudice Rogers.

The state court reasoned that there was no prejudice because the defense could not have "eliminate[d] or completely discredit[ed] the State's proof that sperm heads were found in the crotch area." *Rogers III*, 2012 WL 3776675, at *47. This is plainly an unreasonable application of *Strickland* because Rogers did not need to "eliminate or completely discredit" the semen evidence to undermine confidence in the jury verdict. The majority criticizes this as "flyspeck[ing]" a state-court opinion. Maj. Op. at 11. But there is a difference between requiring a state court to recite magic words in an opinion and requiring that a state court reasonably apply federal constitutional standards as announced by the Supreme Court. By insisting that Rogers "eliminate or completely discredit" the semen evidence, the state court held Rogers's ineffective assistance claim to a higher standard than required by the Supreme Court, which has repeatedly announced that a petitioner need only demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Wiggins*, 539 U.S. at 534.

The state court's misapplication of the *Strickland* standard matters because Rogers can demonstrate a reasonable probability that the result of his sentencing proceeding would have been different absent his counsel's errors without having to "eliminate or completely discredit" the semen evidence. This is not a case in which there was substantial other evidence pointing to rape. *Compare Higgins v. Renico*, 470 F.3d 624, 634 (6th Cir. 2006) (holding that the failure to

cross-examine key witness was prejudicial because without this testimony, the state's case was "far from overwhelming"), *with Poindexter v. Mitchell*, 454 F.3d 564, 572 (6th Cir. 2006) (holding that the failure to cross-examine witness about inconsistencies in testimony was not prejudicial because multiple eyewitnesses testified that they saw the defendant commit the crime). Because penetration—a necessary element of the rape conviction—was "only weakly supported by the record," it was "more likely to have been affected by errors than [a conclusion] with overwhelming record support." *Strickland*, 466 U.S. at 696.

Indeed, the state trial court itself acknowledged that whether there was sufficient evidence to support a rape conviction was a "close call." R. 24-5 (Order at 6) (Page #1173). Therefore, because counsel's performance was undisputedly deficient by failing to undermine the *only* evidence of penetration, and because penetration is a necessary element of a rape conviction under Tennessee law, I believe that it was an unreasonable application of *Strickland* for the state court to hold that counsel's deficient performance did not render the rape conviction unreliable.

## 2. Sentencing-Phase Prejudice Analysis

Once a petitioner's claim overcomes the relitigation bar imposed by 28 U.S.C. § 2254(d), federal courts apply de novo review, because no deference is owed to a state-court decision premised upon an unreasonable application of clearly established federal law. *See Rice v. White*, 660 F.3d 242, 252 (6th Cir. 2011). De novo review compels the conclusion that Rogers was prejudiced by his counsel's deficient performance at the sentencing phase of his trial. That is because the rape of a nine-year-old child is so grievous that in the absence of a rape conviction, there is a reasonable probability that at least one juror would have weighed the aggravating and mitigating factors differently when deciding whether to impose the death penalty.

The Tennessee Code authorizes the death penalty only if the aggravating factors "have been proven by the state beyond a reasonable doubt" and "have been proven by the state to outweigh any mitigating circumstances beyond a reasonable doubt." Tenn. Code Ann. § 39-13-204(g)(1)(A)–(B)). If, after deliberations, "the jury still cannot agree as to sentence, the trial judge shall dismiss the jury and such judge shall impose a sentence of imprisonment for life."

*Id.* § 39-13-204(h)(1) (1996). Thus, if there is a reasonable probability that the rape-related aspect of the offense impacted the way that at least one juror weighed the aggravating and mitigating factors, the error was prejudicial.

The majority is silent as to the impact of § 39-13-204(g)(1)(B) on this court's analysis of the prejudice question, but the requirement that the state prove that the aggravating factors outweigh any mitigating circumstances beyond a reasonable doubt is central to understanding why Rogers was prejudiced by his counsel's errors. The rape of a child is a particularly significant aggravating factor—much more so than many of the other aggravators. An aggravating factor that is accorded such significant weight will thus have a significant impact on this weighing calculus. Because child rape is viewed by our society as uniquely heinous, there is a reasonable probability that at least one juror would have weighed the aggravating and mitigating factors differently absent trial counsel's errors.

The majority further ignores that the Supreme Court has made clear that a child-rape conviction completely distorts the weighing of aggravating and mitigating factors in a way that cannot readily be rectified. *See Kennedy v. Louisiana*, 554 U.S. 407, 439 (2008). Child rape is "a crime that in many cases will overwhelm a decent person's judgment" in a way that makes it difficult for a jury to balance the other aggravating and mitigating factors. *Id.* The majority contends that even absent the rape conviction, the underlying facts of the offense are "inflammatory and disturbing" enough to "result[] in the same sentence." Majority Op. at 12. Of course, the murder of a child is alone disturbing. But the combination of the rape and murder of a nine-year-old child is *so* disturbing that it is significantly likely that the child rape conviction would have "overwhelm[ed]" at least one juror's judgment in a way that affected their weighing of the aggravating and mitigating circumstances. *Kennedy*, 554 U.S. at 439. Although there were multiple aggravating factors in this case, the rape of a child is by far the most significant one. Both crimes are heinous. But raping and murdering a child is far worse than murder alone.

The uniquely aggravating nature of child rape is heightened by the fact that *at the time of Rogers's trial*, the Supreme Court had not yet prohibited the imposition of the death penalty for cases of child rape that did not result in the death of the victim—a fact also unacknowledged by the majority. *See Kennedy*, 554 U.S. 407. The rape of a child was the last non-homicide crime

against a person for which the death penalty was authorized. *Id.* Indeed, child rape continued to be a permissible capital offense for *more than thirty years* after the Supreme Court held the death penalty could not be imposed in cases of rape of adults. *See Coker v. Georgia*, 433 U.S. 584 (1977). This fact plainly demonstrates the extent to which society at the time of Rogers's sentencing hearing reviled the act of child rape. It is true that Tennessee did not, at that time, have the death penalty for child rape, in large part because such a law had previously been invalidated by the Tennessee Supreme Court for imposing a *mandatory*—and thus constitutionally impermissible—death penalty for child rape. *See Collins v. State*, 550 S.W.2d 643, 646 (Tenn. 1977). But the efforts—spanning decades—of elected Tennessee legislators to impose the death penalty for perpetrators of child rape confirm that at least some Tennesseans at the time of Rogers's sentencing proceedings believed that child rape provided independent grounds to impose the death penalty. This further compels my conclusion that there is a reasonable probability that during the sentencing phase at least one juror would have weighed the aggravating and mitigating factors differently absent the child-rape conviction.

The prosecution's sentencing phase strategy also demonstrates how critical the rape aggravator was in securing Rogers's death sentence. During closing argument, the prosecution repeatedly focused on the rape conviction, emphasizing that Rogers killed Beard:

> because he intended to rape this child, which he did. Because he raped the child, he had to remove her from this county, and take her some place where he would hope that she would never, ever be found . . . . And the reason for that, ladies and gentlemen, because of this aggravator, which is so powerful in and of itself that will convince you—convict this man and sentence him to death, because he did not want to see her come through that door back here, walk up that aisle right here, wearing her Minnie Mouse shirt and those teal shorts and those little sandals that she had on, walk up here, take the oath and get in that chair and point the finger of guilt to this man. That's why, that's why he killed her. And ladies and gentlemen, that is enough in of itself to sentence him to death.

R. 25-17 (Tr. at 7–8) (Page ID #5952–53). The prosecution's repeated emphasis on the rape of a child and Rogers's efforts to conceal that rape, and the prosecutor's statements that this alone warrants the death sentence, confirm that, in this case, the rape conviction was prejudicial.

The strength of the mitigating evidence also strengthens my conclusion that, absent the rape aggravator, there is a reasonable probability that at least one juror would have weighed the

aggravating and mitigating factors differently. During the sentencing phase of Rogers's trial, several witnesses testified about the horrific physical abuse that Rogers experienced as a child. *Rogers III*, 2012 WL 3776675, at *10–14. The most significant mitigation witness was Rogers's sibling Sam,**2** who testified that their stepfather "often" "slapp[ed]," "hit[]" and "punch[ed]" them, starting from the time that Rogers was four or five years old. R. 25-13 (Tr. at 112–13, 138–39) (Page ID #5383–84, 5409–10). Sam explained that Rogers was often chained to the bed, for up to days on end. *Id.* at 119–22 (Page ID #5390–93). If Rogers soiled the bed or his pants, their stepfather would rub Rogers's face in the soiled pants or mattress. *Id.* at 124–25, 130 (Page ID #5395–96, 5401). Their stepfather would also lock himself and Rogers in the bathroom, and Sam believed that he was forcibly giving Rogers enemas. *Id.* at 133–36 (Page ID #5404–07). Other witnesses testified about the emotional and sexual abuse that Rogers endured. *Rogers III*, 2012 WL 3776675, at *11–13. Two experts also testified that Rogers's psychological disorders stemmed from the abuse and trauma he endured. *Id.* at *13–14. Because of the substantial weight of the mitigating factors, removing the rape aggravator from the jury's consideration reasonably may have changed the sentencing calculus for at least one juror.

To the extent that the majority implies that the facts may have led the jury to suspect rape from the existence of sperm heads on Beard's shorts, this implication does not affect our analysis. The Tennessee death-penalty scheme directs jurors to weigh only *statutory* aggravating circumstances against all mitigating factors. *See* Tenn. Code Ann. § 34-12-204(g). And these aggravating circumstances must be proven "beyond a reasonable doubt." *Id.*

As explained above, even under AEDPA's deferential standard, I am not confident that, in the absence of his counsel's errors, Rogers would have been convicted of rape. Eliminating the statutory aggravator for rape would have removed the most powerful aggravating factor and would have likely caused the jury to weigh the aggravating and mitigating factors differently at sentencing. Murdering a child is an unspeakably tragic crime. But raping and then murdering a

---

**2**The warden's brief, the state-court decisions, and the district-court decision all refer to Sam as Mildred Rogers, which was Sam's prior name. Sam has since changed their name to Samuale Danielle Roger (no "s"). R. 25-13 (Tr. at 90) (Page ID #5361); R. 112-6 (Roger Decl. at 1) (Page ID #13577).

child is altogether more heinous.  This compels my conclusion that there is a reasonable probability that, to at least one juror, this difference mattered.  I would therefore reverse the district court's decision with respect to this claim and remand to the district court with instructions to grant Rogers's habeas petition on this claim with respect to the sentencing phase.

## II.  APPLICATION OF THE *MARTINEZ-TREVINO* EXCEPTION TO CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL AT THE MOTION-FOR-A-NEW-TRIAL STAGE

Rogers also argues that the *Martinez-Trevino* exception applies to his procedurally defaulted claim that his counsel was ineffective by failing to raise certain arguments in the motion for a new trial.  The principal question before this court is whether the *Martinez-Trevino* exception can apply to claims of ineffective assistance of counsel at the motion-for-a-new-trial stage.[3]  The majority declines to answer this question, contending that Rogers's "claim is 'wholly without factual support'" and thus holding that we need not decide that question.  Majority Op. at 21 (quoting *Martinez v. Ryan*, 566 U.S. 1, 16 (2012)).  Because I believe that we ought to conclude that the *Martinez-Trevino* exception applies to claims of ineffective assistance of counsel at the motion-for-a-new-trial stage and remand to the district court for further consideration, I cannot agree.

In the district court, Rogers's habeas counsel presented extensive and compelling evidence related to the application of the *Martinez-Trevino* exception to his procedurally defaulted claims.  However, after the parties in this case had completed initial briefing and oral argument, the Supreme Court decided *Shinn v. Ramirez*, 142 S. Ct. 1718 (2022), which held that "a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel." 142 S. Ct. at 1734.  Because of the limited briefing at the en banc stage, this court has not had the benefit of complete briefing from the parties regarding the effects of *Shinn* on the proper disposition of this case.  Rogers's supplemental brief, for example, does not address this issue.  Given the dearth of guidance from the parties on this issue, I believe it is imprudent for this court

---

[3]For the reasons thoughtfully explained in Judge Mathis's opinion, I agree that Habeas Rule 2(c) does not bar Rogers's claim of ineffective assistance of counsel at the motion-for-a-new-trial phase, contrary to the majority's assertion.

to determine the extent to which *Shinn* may or may not foreclose the evidence that was presented to the district court related to the application of the *Martinez-Trevino* exception. I would therefore instead decide that the *Martinez-Trevino* exception applies to claims of ineffective assistance of counsel at the motion-for-a-new-trial stage and remand to the district court for further consideration in light of the Supreme Court's decision in *Shinn*.

Turning to the issue of whether the *Martinez-Trevino* exception can apply to Rogers's claim of ineffective assistance of counsel at the motion-for-a-new-trial stage, I first briefly review the existing framework of the exception. Federal habeas courts are barred from considering federal constitutional claims that were defaulted in state court unless the prisoner can demonstrate cause for the default and actual prejudice that resulted or a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Although ineffective assistance of counsel on direct appeal may constitute cause to excuse the default, ineffective assistance of postconviction counsel typically "cannot constitute cause to excuse the default in federal habeas." *Id.* at 757. In *Martinez*, the Court established a "narrow exception" to this rule: "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 566 U.S. at 9. The Court has subsequently extended *Martinez* to states in which the "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." *Trevino v. Thaler*, 569 U.S. 413, 429 (2013).

The *Martinez-Trevino* exception can excuse procedural default when a petitioner claims that *trial* counsel was ineffective. *Martinez*, 566 U.S. at 17. But it does not apply when a petitioner claims that *appellate* counsel was ineffective. *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017). Neither this court nor the Supreme Court has addressed whether the *Martinez-Trevino* exception can apply when the underlying ineffective assistance occurred in a motion for a new trial.

Several courts have addressed whether the *Martinez-Trevino* exception applies to ineffective-assistance-of-post-sentencing-counsel claims, but these courts have arrived at different answers. The Third Circuit has held that, on federal habeas review, a court may

consider a defaulted claim that a post-sentencing lawyer was ineffective. *Richardson v. Superintendent Coal Twp. SCI*, 905 F.3d 750, 756 (3d Cir. 2018). The Third Circuit reasoned that "the line dividing trial from appeal falls naturally at the notice of appeal" and because "[p]ost-sentencing motions precede the notice of appeal, . . . they fall on the trial side of the line." *Id.* The Third Circuit further explained that "[s]entencing and post-sentencing proceedings also differ categorically from appeals" because "[c]ounsel direct sentencing and post-sentencing arguments to the same trial court," and post-sentencing counsel "may also develop the record by proffering new evidence, which the trial court may hear at an evidentiary hearing." *Id.* at 761. It also determined that the equitable principles in *Martinez* apply when the underlying ineffective-assistance claim relates to a post-sentencing proceeding because "[m]any states do not entertain ineffective-assistance claims on direct appeal." *Id.* at 762. Declining to apply the *Martinez-Trevino* exception to these claims would thus "prevent state and federal courts from ever looking at meritorious ineffective-assistance-of-post-sentencing-counsel claims." *Id.*

The Fifth Circuit has reached the opposite conclusion, albeit in a nonprecedential opinion. *Milam v. Davis*, 733 F. App'x 781, 786 (5th Cir. 2018) (per curiam). Without further analysis, the Fifth Circuit held that a federal court could not hear a petitioner's claim that "appellate counsel was ineffective for failing to raise [certain claims], in a motion for new trial or on direct appeal," *id.* at 782, because "the Supreme Court has held that *Martinez* does not extend to ineffective assistance of appellate counsel claims," *id.* at 786 (citing *Davila*, 137 S. Ct. at 2065).

I find the Third Circuit's thorough analysis to be persuasive. As the Third Circuit explained was true in Pennsylvania, motions for a new trial in Tennessee courts "differ categorically from appeals." *Richardson*, 905 F.3d at 761. Motions for a new trial are heard before the same court that presided over the trial, and the court may allow new testimony from witnesses. Tenn. R. Crim. P. 33(a), (c)(1). These similarities suggest that claims stemming from a motion for a new trial are more similar to claims that trial counsel was ineffective than claims that appellate counsel was ineffective.

As the Third Circuit explained, the notice of appeal is the appropriate transition point between trial and appeal.  In Tennessee, the filing of a notice of appeal is addressed jointly by the Rules of Criminal Procedure and the Rules of Appellate Procedure.  *See* Tenn. R. Crim. P. 37(d)(1) (instructing the defendant to "file a timely notice of appeal with the clerk in accordance with Rule 4(a), Tennessee Rules of Appellate Procedure"); Tenn. R. App. P. 3–4.  But a motion for a new trial is treated as separate from the appeals process.  *See Fahey v. Eldridge*, 46 S.W.3d 138, 141 (Tenn. 2001) ("[I]n order to preserve errors for appeal, the appellant must first bring the alleged errors to the attention of the trial court in a motion for a new trial.").

Additionally, the equitable considerations that guided the decisions in *Martinez* and *Trevino* apply with equal force to ineffective-assistance claims related to a motion for a new trial.  In *Martinez*, the Supreme Court acknowledged that an exception was necessary so that the underlying ineffective-assistance claim "will have been addressed by one court."  566 U.S. at 11.  *Davila* thus differentiated ineffective-assistance-of-*trial*-counsel claims from ineffective-assistance-of-*appellate*-counsel claims, because when a claim relates to ineffective assistance of appellate counsel, "at least 'one court' will have considered the [underlying trial error] on the merits."  *Davila*, 137 S. Ct. at 2067 (quoting *Martinez*, 566 U.S. at 11).  This is because "[i]f trial counsel preserved the error by properly objecting," but appellate counsel dropped the ball, then "that claim of trial error 'will have been addressed by . . . the trial court."  *Id.* (quoting *Martinez*, 566 U.S. at 11).  But "[i]f an unpreserved trial error was so obvious that appellate counsel was constitutionally required to raise it on appeal, then trial counsel likely provided ineffective assistance by failing to object to it in the first instance," and "the prisoner likely could invoke *Martinez* or *Coleman* to obtain review of trial counsel's failure to object."  *Id.* at 2067–68.

If the *Martinez* exception does not apply to claims that counsel was ineffective on a motion for a new trial in Tennessee, certain claims may never be heard.  In Tennessee, motions for a new trial are the preferred procedural mechanism for bringing trial errors to the attention of the trial court.  Indeed, trial counsel[4] *must* renew their objections in a motion for a new trial

---

[4]As this court explained in *Sutton v. Carpenter*, "[i]n a typical Tennessee case, it is likely that trial counsel *will* file the motion for new trial because Tennessee requires appointed trial counsel to continue representation throughout a defendant's direct appeal, and permits withdrawal only on a showing of good cause."  745 F.3d 787, 793 (6th Cir. 2014) (footnote omitted) (citing TENN. SUP. CT. R. 13(e)(5); TENN. CODE ANN. § 40-14-205(a)).

within thirty days of sentencing in order to properly preserve those issues for appellate review. Tenn. R. App. P. 3(e); Tenn. R. Crim. P. 33(b); *State v. Harbison*, 539 S.W.3d 149, 164 (Tenn. 2018) ("Grounds not raised in a motion for new trial are waived for the purposes of appeal."). Motions for a new trial in Tennessee preserve the trial objections and are the mechanism by which trial counsel are expected to allow the "trial court" to address claims of "trial error." *See Davila*, 137 S. Ct. at 2067. Thus, if counsel is ineffective at this stage, all trial issues will be waived. Tenn. R. App. P. 3(e); *see also Harbison*, 539 S.W.3d at 164. Accordingly, application of the *Martinez-Trevino* exception to ineffective-assistance claims at the Tennessee motion-for-a-new-trial stage is necessary to ensure that all of a defendant's trial claims can be heard in at least one court.

Reaching this conclusion would not expand the *Martinez-Trevino* exception to a new category of cases. Rather, I would simply clarify that claims of ineffective assistance at the Tennessee motion-for-a-new-trial phase fit neatly within the larger bucket of trial claims, which are already recognized as within the scope of the *Martinez-Trevino* exception. I would therefore hold that, in a state such as Tennessee, the *Martinez-Trevino* exception applies to claims that counsel was constitutionally ineffective on a motion for a new trial, and remand to the district court for further consideration.

## III. Conclusion

For the foregoing reasons, I would reverse the district court's denial of habeas relief as to Rogers's claim that his trial counsel was constitutionally ineffective in failing adequately to challenge the semen evidence and remand to the district court with instructions to grant conditionally a writ of habeas corpus vacating Rogers's death sentence on that ground. I would also hold that the *Martinez-Trevino* exception can excuse the procedural default of a claim of ineffective assistance of counsel at the motion-for-a-new-trial stage and would remand to the district court with instructions to determine whether Rogers can overcome his procedural default of that claim. Accordingly, I respectfully dissent.