RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0151p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

STEVE ELLIS KARACSON,

　　　　　　　*Petitioner-Appellant*,

　　　*v.*

DAVID SHAVER, Warden,

　　　　　　　*Respondent-Appellee.*

No. 25-1089

─────────────

Appeal from the United States District Court for the Eastern District of Michigan at Flint.
No. 4:20-cv-13100—Matthew F. Leitman, District Judge.

Argued: April 28, 2026

Decided and Filed: May 20, 2026

Before: THAPAR, BUSH, and MURPHY, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Bailey Lindsey, Adam B. Murphy, Miles Pulsford, NEW YORK UNIVERSITY SCHOOL OF LAW, New York, New York, for Appellant. Scott R. Shimkus, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Bailey Lindsey, Adam B. Murphy, Miles Pulsford, Daniel S. Harawa, NEW YORK UNIVERSITY SCHOOL OF LAW, New York, New York, for Appellant. Scott R. Shimkus, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

─────────────

## OPINION

─────────────

THAPAR, Circuit Judge. Steve Karacson set fire to his own house. So a Michigan jury convicted him of arson and insurance fraud at a trial where he represented himself.

Karacson then petitioned for a writ of habeas corpus, arguing that he didn't waive his right to counsel. But the district court denied his petition because Michigan state courts reasonably rejected his claim on direct appeal. We affirm.

I.

In 2017, a fire devastated Steve Karacson's house. It took firefighters two or three hours to put out the flames. The next day, investigators entered the house with an arson dog and detected the smell of gasoline. They also determined that the fire had multiple origin points inside the house. After reviewing this evidence and eliminating other possible causes, they concluded the fire was an act of arson. Karacson had fire insurance, so the investigation focused on him.

Karacson told investigators he wasn't home on the night of the fire. He claimed instead that he'd traveled to Kentucky two days before the fire and returned the morning after the fire. But location data from his cell phone said otherwise. The morning before the fire, Karacson's phone connected to towers along a route heading north from Kentucky back to Michigan. And less than an hour before the fire, his phone pinged a tower near his house. Police officers also found a receipt in Karacson's wallet showing that, just hours before the fire, he had bought a five-gallon gas can and a pair of utility gloves from a Michigan hardware store. So Michigan charged Karacson with arson and insurance fraud.

Karacson pled not guilty. A month later, he sought to fire his court-appointed attorney for refusing to file certain motions on his behalf. The trial court denied Karacson's request for a new attorney. But Karacson eventually got his way: Soon after his motion, his attorney asked to withdraw as counsel, citing his inability to have any "meaningful discussion" with Karacson about the case. R. 26-4, Pg. ID 301–02. The attorney told the court that Karacson had written letters to the public defender's office about him and even filed a grievance against him. So the court granted the motion to withdraw.

A few days later, the court assigned a second attorney to represent Karacson. This new partnership started promisingly. The new attorney successfully negotiated a major reduction in Karacson's bond and rejected the state's plea offers on Karacson's behalf. But somewhere along

the way, the relationship soured. Karacson filed a grievance against his attorney less than 20 days before trial. The attorney later advised the trial court that Karacson wanted to represent himself. On the day of jury selection, Karacson confirmed that interest. And when the court asked Karacson if he still wanted to represent himself, Karacson replied, "I believe so at this time." R. 26-8, Pg. ID 325.

So the trial court warned Karacson about the dangers of self-representation. It reminded Karacson that one of the counts against him carried a possible life sentence and emphasized the "very serious charges" against him. *Id.* at 326. After learning that Karacson was 60 years old, the court warned Karacson that self-representation was "a great risk." *Id.* And the court told Karacson that he would have to follow complex procedural rules that the court must enforce against him. After describing all these risks, the court asked, "Are you sure you want to do that?" *Id.* at 327. Karacson replied, "Yes." *Id.* But when the court next asked whether Karacson wanted to represent himself in the jury-selection process, Karacson didn't say anything. The court added that it would appoint Karacson's counsel as his standby advisor so that Karacson could consult him throughout the trial. It then informed Karacson that he could "make a final decision" after a lunch break. *Id.* at 327–28.

When the break ended, Karacson told the court that he wasn't willing to move forward with the case and requested a new attorney. His current attorney agreed with Karacson's request based on his "real clear disagreements" with Karacson about the case, including over whether to file various motions. *Id.* at 335. The attorney told the court that he didn't want to pursue Karacson's proposed defense theory.

But the court denied Karacson's request. It told Karacson that he could have filed the motions himself and pointed out that both of his lawyers had refused to acquiesce, "perhaps, wisely so." *Id.* at 338. The court also reminded Karacson that because he had said that he wanted to represent himself and a jury panel was already "waiting in the hallway," it wouldn't grant Karacson new counsel at this late stage. *Id.* at 335. So Karacson proceeded to represent himself with his attorney as standby counsel.

The jury convicted Karacson on all counts.  Although his conviction carried a possible life sentence, the trial court opted for a more lenient punishment.  It reasoned that Karacson hadn't hurt anyone, harmed anyone else's property, or received any insurance money.  The court therefore sentenced him to only seven years in prison.

Karacson appealed his conviction and sentence to the Michigan Court of Appeals.  He alleged a host of defects with his conviction, including that he was deprived of the right to counsel.  *People v. Karacson*, No. 346236, 2020 WL 908944, at *2–7 (Mich. Ct. App. Feb. 25, 2020) (per curiam).  The appellate court rejected all of his claims.  *Id.* at *10.  In relevant part, the court denied Karacson's right-to-counsel claim because he wasn't entitled to substitute counsel on the morning of trial and the trial court reasonably determined that Karacson had waived his right to counsel.  *Id.* at *4–6.  The Michigan Supreme Court denied Karacson's application for leave to appeal and his subsequent motion for reconsideration.  *See People v. Karacson*, 948 N.W.2d 559, 559 (Mich. 2020) (order); *People v. Karacson*, 951 N.W.2d 896, 896–97 (Mich. 2020) (order).

So Karacson petitioned a federal court for a writ of habeas corpus.  In his petition, he argued that the state trial court deprived him of his right to counsel in violation of the Sixth Amendment.  *See United States v. Cronic*, 466 U.S. 648, 659 (1984).  After a hearing, the district court denied Karacson's petition because the Michigan Court of Appeals reasonably concluded Karacson had waived his right to counsel.  The district court likewise found that the state court reasonably concluded Karacson's waiver was voluntary.  Nevertheless, the district court granted Karacson a certificate of appealability.  *See* 28 U.S.C. § 2253(c).  After his release from custody, Karacson appealed.[1]

II.

The Antiterrorism and Effective Death Penalty Act (AEDPA) governs our review of federal habeas petitions.  Here, a Michigan state court already addressed the merits of Karacson's

---

[1]Karacson filed his petition in the district court while in custody, so postconviction habeas relief is still statutorily available to him.  *See Spencer v. Kemna*, 523 U.S. 1, 7 (1998).  And we maintain jurisdiction over the petition because Karacson continues to face collateral consequences from his felony conviction, such as the inability to possess firearms or serve on juries.  *See id.* at 7–9; 18 U.S.C. § 922(g)(1); Mich. Comp. Laws § 600.1307a(1)(e).

Sixth Amendment claim.  So to obtain relief under AEDPA, Karacson must show that the Michigan court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "based on an unreasonable determination of the facts in light of the evidence" before the state court.  28 U.S.C. § 2254(d)(1)–(2).  This standard is "highly deferential."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quotation omitted).  To meet it, Karacson must show that the Michigan court "applie[d] Supreme Court precedent in a way that no fair-minded judge could accept."  *Rogers v. Mays*, 69 F.4th 381, 389 (6th Cir. 2023) (en banc).  But he can't do so.

A.

At the outset, Karacson urges us to ignore AEDPA's standard of review.  He argues that we shouldn't defer to the Michigan appellate court's decision because it mischaracterized the record and didn't properly apply Supreme Court precedent.  But Karacson's argument that the Michigan Court of Appeals made unreasonable determinations of fact is really a legal claim.  That's because the state court was making a legal determination about whether the facts satisfied the applicable standard for relief.  *Id.* at 392–93.  So Karacson's claims that the state court "omitted or misdescribed" factual issues when deciding whether he waived his right to counsel are ultimately "*legal* questions."  *Id.* at 393 (emphasis in original).  That means Karacson must show the state court contradicted or unreasonably applied clearly established law from the Supreme Court.  *Id.* (citing 28 U.S.C. § 2254(d)(1)).

Applying this deferential framework, we presume that the state court's conclusions were reasonable.  *White v. Plappert*, 131 F.4th 465, 477 (6th Cir. 2025).  And if *any* reasonable argument supports the state court's decision, Karacson can't obtain relief.  *Id.* at 477–78.  Because there are reasonable arguments that Karacson voluntarily waived his right to counsel, the district court properly denied Karacson's petition.

B.

The Constitution grants criminal defendants the right to assistance of counsel when facing imprisonment.  *Faretta v. California*, 422 U.S. 806, 807, 832 (1975).  But a defendant may waive that right by choosing to represent himself.  If he does so, the waiver must be

knowing, intelligent, and voluntary.  *Id.* at 835–36.  The specific "facts and circumstances" of each case, including the defendant's "background, experience, and conduct," determine whether those conditions are satisfied.  *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).  In particular, for a waiver to be knowing, the defendant should be "aware of the dangers and disadvantages of self-representation."  *Faretta*, 422 U.S. at 835.  So we look to the entire record to determine whether the Michigan appellate court reasonably found that Karacson knowingly, intelligently, and voluntarily waived his right to counsel.

The record shows that Karacson knowingly and intelligently waived that right before trial.  His second attorney told the trial court that Karacson had previously expressed interest in self-representation.  Karacson confirmed that fact when he said he "believe[d]" he wanted to represent himself.  R. 26-8, Pg. ID 325.  The trial court proceeded to ensure Karacson was committed to representing himself.  It explained the dangers of that choice, including a possible life sentence and the difficulty of following the rules of procedure.  After hearing this explanation, Karacson said, "Yes, sir."  *Id.* at 327.  The court asked, "Are you sure you want to do that?"  *Id.*  And Karacson again replied, "Yes."  *Id.*  This clear affirmation established that, despite knowing the trouble he might face, Karacson intentionally waived his right to counsel.

Karacson repeatedly confirmed this choice during his trial.  The trial court warned Karacson about the difficulties of self-representation throughout trial and continued to ask whether he still wanted to represent himself.  For instance, the court reminded Karacson about the "peril" involved in self-representation, especially when facing a life sentence, and urged him to "constantly reevaluate" his decision to represent himself.  R. 26-9, Pg. ID 601.  Karacson acknowledged this warning and forged ahead.  Later, the court explicitly asked—twice in a row—if Karacson still wanted to proceed without counsel.  Even though the court told Karacson he "would benefit" from counsel, Karacson doubled down on his choice to represent himself.  R. 26-10, Pg. ID 670–71.  The court also gave Karacson two chances to back out of giving his own closing argument.  Once again, he did it himself.  By choosing to represent himself even when warned of the risks, Karacson confirmed that his waiver was intentional.

Karacson raises several objections, but none shows that the Michigan appellate court's decision was unreasonable.  First, he argues that he didn't unequivocally waive his right to

counsel for the jury-selection process.  *See Faretta*, 422 U.S. at 835.  But the state court reasonably found that Karacson's waiver met that standard.  That's because he told the court twice that he had decided to represent himself.  *See Pouncy v. Palmer*, No. 21-1811, 2025 WL 1341850, at *10 (6th Cir. May 8, 2025) (per curiam).  Those two statements gave the state court a sufficient basis to find unequivocal waiver.

Nevertheless, Karacson argues that his actions after these initial declarations undermine his waiver.  When the court asked if he wanted to represent himself during jury selection, Karacson didn't answer.  The court then told him that he would have "some time to think about it" during a lunch break and could "make a final decision" afterwards.  R. 26-8, Pg. ID 327–28.  Karacson asked if he could talk to his attorney about it, and the court told him he could.  When they returned, Karacson asked for yet another attorney because he wasn't "seeing eye to eye" with his current one.  *Id.* at 334.  But the court didn't assign Karacson a new attorney given the last-minute nature of his request, and Karacson went on to represent himself during jury selection.  During this process, Karacson twice referred to the attorney as "my attorney," not as his former counsel.  *Id.* at 328, 334.  Karacson says that this chain of events shows that his waiver wasn't unequivocal.

He's wrong:  The state court reasonably found that Karacson's later actions didn't undo his earlier waiver.  To start, the state court could have reasonably concluded that Karacson's initial silence over whether he wanted to represent himself during jury selection didn't make his waiver invalid.  Indeed, the Supreme Court has concluded that an "implicit waiver" can occur when defendants are notified of their rights and take actions inconsistent with them.  *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010) (quotation omitted).  It thus held that a defendant who was warned of his right to remain silent implicitly waived this right when he decided to speak, even though he never expressly said that he was waiving the right.  *Id.* at 384–86.  The state court could have reasonably taken the same approach in this right-to-counsel context.  Karacson learned of his right to counsel and of the risks of representing himself but then chose to represent himself anyway.

Nor do the events after the lunch break change things.  Karacson's lawyer reaffirmed that he was Karacson's standby counsel—because Karacson had earlier chosen to represent himself.

Karacson's references to "my attorney" don't prove otherwise. After all, what else would Karacson call him? The attorney was still Karacson's standby counsel, and he continued to aid Karacson throughout trial even though Karacson was representing himself. He even introduced himself to the jury pool as someone who would be "assisting" Karacson, and the trial court called the attorney a "kind of legal advisor." R. 26-8, Pg. ID 354. In fact, Karacson continued to refer to the attorney as "my attorney" at the end of the third day of trial, when there was no doubt Karacson had chosen to represent himself. R. 26-10, Pg. ID 889–90. So a fairminded jurist could conclude that Karacson's wording didn't undermine his clear waiver.

Karacson's request for a new attorney didn't render his waiver equivocal, either. The trial court rejected that request, pointing out that, with the jury panel "waiting in the hallway," his request didn't come at a "very good time." R. 26-8, Pg. ID 335. After all, timeliness is a key factor when considering a motion to substitute counsel. *United States v. Vasquez*, 560 F.3d 461, 466 (6th Cir. 2009). So given the choice between his standby counsel and himself, Karacson proceeded to represent himself during jury selection. *Cf. Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989) (noting that defendants have only the right to competent court-appointed counsel, not counsel of their choosing or liking); *United States v. Pittman*, 816 F.3d 419, 425–26 (6th Cir. 2016) (finding that a defendant proceeding pro se after continually "express[ing] dissatisfaction with" appointed counsel evidenced waiver of right to counsel). Without objecting, he exercised peremptory challenges, suggested for-cause challenges, and delivered an opening statement the same day. All this record evidence indicates Karacson didn't renege on his initial unequivocal waiver.

Karacson also argues that the court didn't clearly ask him whether he wanted to represent himself. He contends that when the court asked, "Are you sure you want to do that?", it may have been asking Karacson whether he was sure he wanted to "follow the rules." R. 26-8, Pg. ID 327. But that's not what the record shows. Just before its question to Karacson, the court spent substantial time explaining not only that Karacson would have to follow the rules, but also that he was facing a potential life sentence and that self-representation was risky. Immediately after that explanation, the court asked, "Are you sure you want to do that?" *Id.* So the most natural

interpretation, considering everything the court had just said, is that it was asking Karacson if he was sure he wanted to represent himself.

Karacson then contends that the court didn't sufficiently describe the risks of self-representation, noting that the trial court spent "just 217 words" warning him. Appellant's Br. at 38. But the Supreme Court hasn't laid out any magic words that trial judges must read to apprise defendants of the potential risks of self-representation. *See King v. Bobby*, 433 F.3d 483, 492 (6th Cir. 2006). Nor has it clearly established that state courts must provide "formal warnings" to such defendants. *Carruthers v. Mays*, 889 F.3d 273, 291 (6th Cir. 2018). And it certainly hasn't imposed a word count. As the Court said in a related context, the waiver "standard" from *Johnson* (the one that applies here) allows waiver "through means less formal than a typical waiver on the record in a courtroom." *Berghuis*, 560 U.S. at 385. So the Court may eventually hold that a waiver of the right to counsel follows less demanding rules than the (still unclear) rules that the Court has established for guilty pleas that waive the right to a jury trial. *Cf. Johnson v. Plappert*, 163 F.4th 1029, 1036–37 (6th Cir. 2026) (discussing *Boykin v. Alabama*, 395 U.S. 238 (1969)).

Consider *Faretta*. There, the trial judge warned the defendant that self-representation would be a mistake and that he would have to follow all the rules of trial procedure. *Faretta*, 422 U.S. at 835–36. The Supreme Court found that those simple—and brief—warnings were sufficient. *Id.* at 836. Here, the court similarly informed Karacson that self-representation was a "great risk," that he'd have to follow all the difficult "rules of engagement," and that he faced "very serious charges" that might put him in prison for life. R. 26-8, Pg. ID 326. This explanation of the "dangers and disadvantages of self-representation" sufficed to ensure Karacson invoked his right knowingly. *Faretta*, 422 U.S. at 835. At the very least, a fairminded jurist could agree with that conclusion.

Even if the trial court gave sufficient warnings, Karacson claims the court didn't ask enough questions to confirm his waiver was valid. He believes a judge must make a "penetrating and comprehensive examination" of the circumstances to ensure the defendant knows what he's doing. *Von Moltke v. Gillies*, 332 U.S. 708, 724 (1948) (plurality opinion). But this argument also fails.

For one thing, the *Von Moltke* plurality's broad language speaks "at a high level of generality," so it doesn't offer a ground for habeas relief. *Brown v. Davenport*, 596 U.S. 118, 136 (2022). To be sure, the plurality lays out in detail what a defendant should *know* before waiving his right. *Von Moltke*, 332 U.S. at 724. But it doesn't explain when the judge's job is done. The words "penetrating" and "comprehensive" don't give the trial court clear direction. When does an examination cross the threshold into being "comprehensive"? At what point has the court considered the circumstances enough? The *Von Moltke* plurality doesn't say. And when the Court announces a rule without much specificity, state courts have substantial "leeway" in applying it to individual cases. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). That's because broad and abstract propositions don't "clearly establish" specific binding legal rules. *Lopez v. Smith*, 574 U.S. 1, 6 (2014) (per curiam); *see* 28 U.S.C. § 2254(d)(1). Rather, those propositions give fairminded jurists plenty of room to disagree. *Chandler v. Brown*, 146 F.4th 536, 551–52 (6th Cir. 2025) (Thapar & Murphy, JJ., dissenting from the denial of rehearing en banc). Because "penetrating and comprehensive" is a broad and abstract proposition, Karacson can't rely on it to obtain habeas relief.

For another thing, only a plurality of the Supreme Court joined the *Von Moltke* opinion that Karacson cites. *Von Moltke*, 332 U.S. at 709. By contrast, the opinion concurring in the narrowest grounds—which is binding under the *Marks* rule—didn't decide whether the defendant waived her right to counsel. *See id.* at 727–31 (opinion of Frankfurter, J.); *Marks v. United States*, 430 U.S. 188, 193 (1977). And the requirement that a court's examination be "penetrating and comprehensive" doesn't appear in that opinion. *Contrast Von Moltke*, 332 U.S. at 724 (plurality opinion), *with id.* at 727–31 (opinion of Frankfurter, J.). So the Michigan state courts weren't required to apply the plurality's "penetrating and comprehensive" language.

In fact, the Supreme Court has only once repeated the supposed requirement of a "penetrating and comprehensive examination" that Karacson references throughout his brief. Appellant's Br. at 32, 38, 44–45. And that was in a footnote in a case about the Fourth and Fourteenth Amendments. *Schneckloth v. Bustamonte*, 412 U.S. 218, 244 n.32 (1973); *see id.* at 219. But the Court's block quotation from the *Von Moltke* plurality in a footnote to a case about a different amendment wasn't part of its holding. *See Wright v. Spaulding*, 939 F.3d 695, 701

(6th Cir. 2019). And *Von Moltke*'s language seems to conflict with the Court's later precedent making clear that a valid waiver doesn't require a "formal" inquiry "on the record in a courtroom." *Berghuis*, 560 U.S. at 385. Therefore, *Von Moltke*'s language doesn't qualify as clearly established federal law determined by the Supreme Court—which is what AEDPA requires to grant relief.

Even if a state court were required to follow the *Von Moltke* plurality opinion and its broad language, the court here didn't unreasonably apply it. The trial court in *Von Moltke* didn't mention the implications of the defendant's charges. *Von Moltke*, 332 U.S. at 717 (plurality opinion). It didn't discuss the consequences of a guilty plea. *Id.* And it didn't tell the defendant that a death sentence was possible. *Id.* at 717–18. Under those circumstances, the plurality found the defendant's waiver dubious. *Id.* at 724. But here, the state trial court did much more. It explained the implications of Karacson's charges. It told Karacson that self-representation was a "great risk." R. 26-8, Pg. ID 326. And it laid out the complexities of the rules Karacson would have to follow. When Karacson acknowledged this explanation and reaffirmed that he wanted to represent himself, the trial court reasonably concluded that his waiver was knowing and understanding.

Finally, Karacson claims the state courts and district court didn't "indulge every reasonable presumption against waiver." *Fowler v. Collins*, 253 F.3d 244, 249 (6th Cir. 2001) (citing *Johnson*, 304 U.S. at 464). But this argument also fails. For starters, the state court's waiver analysis still deserves strong deference. Karacson's argument that we must "indulge every reasonable presumption against waiver" *on habeas review* creates serious tension with our role under AEDPA. Appellant's Br. at 29 (citing *Fowler*, 253 F.3d at 249). True, on direct review, state courts should "indulge every reasonable presumption against waiver." *Johnson*, 304 U.S. at 464 (quoting *Aetna Ins. Co. v. Kennedy ex rel. Bogash*, 301 U.S. 389, 393 (1937)). But federal courts in habeas review must view state courts' decisions through AEDPA's deferential lens. *Borns v. Chrisman*, 167 F.4th 335, 347 (6th Cir. 2026). As the district court here acknowledged, AEDPA doesn't ask whether the "federal habeas court *itself*" finds error. *Brown*, 596 U.S. at 136 (emphasis in original). Instead, as the Supreme Court has repeatedly clarified since *Fowler*, "AEDPA asks whether *every* fairminded jurist would agree that an error

was prejudicial." *Id.* (emphasis in original). That means if we're at all unsure whether the state court contradicted or unreasonably applied clearly established Supreme Court precedent, Karacson's petition must fail. *White*, 131 F.4th at 477. And Karacson hasn't shown that every fairminded jurist would agree that the state courts unreasonably found waiver.

Even a jurist indulging "every reasonable presumption against waiver" could still find that Karacson waived his right to counsel. Contrast this case with *Fowler*. There, the state trial court merely asserted that it was "confident" the defendant understood the consequences of representing himself. *Fowler*, 253 F.3d at 247. But it didn't explain any of the associated risks. *Id.* at 247–48. Rather, it allowed the defendant to waive the reading of the indictment and an explanation of his rights even though he faced a "long and complex indictment" with over 48 counts. *Id.* at 247, 250. Those counts—of passing bad checks and theft by deception—involved a long sequence of fraudulent conduct over the course of a month. Memorandum in Support of Jurisdiction at 2, *State v. Fowler*, 673 N.E.2d 146 (Ohio 1996) (No. 96-1930), 1996 WL 33679591, at *2. So the defendant there had his hands full.

Here, by contrast, Karacson faced just three charges: arson of an insured dwelling, second-degree arson, and insurance fraud. All three charges boiled down to one simple question: Did he burn his house down or not? If he didn't, then he couldn't have committed any of those crimes. So Karacson understood the nature of the case against him. In fact, on the same day that he waived his right to counsel, Karacson told the jury that the state needed to prove that he burned down his house, and he planned to show that he didn't do so. Additionally, the trial court here—unlike in *Fowler*—described the risks of self-representation. Because the nature of Karacson's charges and the trial court's warnings differed so much from *Fowler*, and because Karacson explicitly said he wanted to represent himself, the state court reasonably concluded that he knowingly and intelligently waived his right to counsel.

## C.

Karacson also claims that his waiver wasn't voluntary. He relies on the principle that "the choice between unprepared counsel and self-representation" isn't a voluntary choice at all. *Pouncy v. Palmer*, 846 F.3d 144, 161 (6th Cir. 2017) (quoting *James v. Brigano*, 470 F.3d 636,

644 (6th Cir. 2006)). So Karacson argues that because his lawyer wasn't prepared to represent him, his decision to represent himself wasn't voluntary.

But the Supreme Court has never established this rule. Instead, the Court has simply required a defendant to make the choice to represent himself "with eyes open." *Faretta*, 422 U.S. at 835 (quotation omitted). Other than that, the Supreme Court has never addressed the relationship between unprepared counsel and the voluntariness of waiver.**[2]** *See Pouncy*, 846 F.3d at 161. Here, Karacson made his informed choice with a clear understanding of the risks and consequences of self-representation. *See supra* Section II.B. It was therefore a voluntary choice made "with eyes open."

In response, Karacson points to Sixth Circuit cases suggesting that the unpreparedness of his counsel could make his waiver involuntary. But that argument isn't based on a specific rule of the Supreme Court, so it shouldn't provide a basis for habeas relief. *See Pouncy*, 846 F.3d at 161. Still, previous panels of our court found it clearly established that "the choice between unprepared counsel and self-representation is no choice at all." *James*, 470 F.3d at 644 (citing *Fowler*, 253 F.3d at 249–50). Yet it isn't clear whether these cases survive later holdings from the Supreme Court explaining that statements by our court can't "refine or sharpen" the Supreme Court's principles into clearly established law under AEDPA. *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013) (per curiam); *see Fields v. Jordan*, 86 F.4th 218, 238–39 (6th Cir. 2023) (en banc).

Regardless, we need not decide the continued validity of these cases, because Karacson's claim of involuntary waiver fails even accepting them. To succeed, Karacson must prove that no fairminded jurist could believe that his counsel was prepared enough to render Karacson's waiver voluntary. *See Pouncy*, 846 F.3d at 161–63. That's an "uphill battle" that Karacson can't win—because his counsel *was* prepared for trial. *Id.* at 161. Karacson tries to prove unpreparedness by citing cases where the defendants' counsel explicitly admitted they were

---

**[2]**In fact, the Court usually connects voluntariness to whether the waiver was knowing and intelligent. For instance, it clarified that a defendant's waiver is voluntary if he understands his right and its general application under the circumstances. *Iowa v. Tovar*, 541 U.S. 77, 92 (2004). His decision doesn't become involuntary just because he doesn't know all the "*specific detailed* consequences" of waiver. *Id.* (emphasis in original) (quoting *United States v. Ruiz*, 536 U.S. 622, 629 (2002)).

unprepared for trial.**3** *See James*, 470 F.3d at 644; *Pazden v. Maurer*, 424 F.3d 303, 315 (3d Cir. 2005). But Karacson's counsel never said he was unprepared. While he supported his client's motion for a new attorney, he did so because he didn't believe he could pursue Karacson's theory of the case, and disagreements on trial strategy don't render counsel unprepared. *Cf. Strickland v. Washington*, 466 U.S. 668, 689 (1984) (instructing courts not to second-guess trial strategy when considering ineffective-assistance-of-counsel claims). Indeed, the attorney had ably represented Karacson before trial by negotiating a bond reduction and rejecting the state's plea offers. And as standby counsel throughout trial, the attorney spoke with the trial court in a way that revealed his familiarity with the law and the facts of the case. Together, these actions indicate that the attorney was prepared to proceed. So Karacson wasn't faced with a choice between unprepared counsel or no counsel at all.

Karacson replies that his counsel failed to file any motions on his behalf or investigate his proposed alibi witnesses. But that wasn't because his counsel was incompetent or unprepared. Although Karacson's counsel didn't reveal exactly why he chose not to file *all* of Karacson's proposed motions, he mentioned that he thought several of them weren't "pertinent." R. 26-8, Pg. ID 339. He further noted that Karacson's first attorney also didn't feel comfortable filing the motions Karacson requested. An attorney's intentional decision not to file motions—whether for strategic or ethical reasons—doesn't mean that he's unprepared for trial.

As for the alibi witnesses, Karacson's counsel didn't want to violate any attorney-client privilege by explaining to the trial court exactly what he and Karacson had discussed about the investigation. But the attorney could reasonably have decided that obtaining statements from any purported witnesses wouldn't have helped Karacson's defense. That's because Karacson had initially lied about where he was on the day of the fire: He told police he was in Kentucky all day, but a receipt in his wallet proved he was actually in Michigan a few hours before the fire. Karacson later changed his story to say that he was at a friend's house in Michigan the night of the fire. But he didn't want the police to ask that friend any questions, so it's unclear how

---

**3**Karacson also cites an Eighth Circuit case relying on this "Hobson's choice" theory. Appellant's Br. at 48–49 (citing *Gilbert v. Lockhart*, 930 F.2d 1356, 1359–60 (8th Cir. 1991)). But that case came before the 1996 passage of AEDPA. *See Brown*, 596 U.S. at 122. Because courts must now apply the stringent AEDPA test to grant habeas relief, the Eighth Circuit's decision doesn't inform our analysis. *See id.* at 134.

anyone could have confirmed his story. Thus, Karacson can't show that his attorney was unprepared for trial. Instead, a fairminded jurist could decide that Karacson had a reasonable choice between adequate counsel and representing himself. So Karacson isn't entitled to habeas relief on this ground either.

\* \* \*

We affirm.